**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JEROME SIDNEY BARRETT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-00062** |
| | ) | |
| **KEVIN GENOVESE, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Jerome Sidney Barrett, a state prisoner, filed a *pro se* petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1) and an amended habeas petition (Doc. No. 3) (collectively, the "Petition"). Respondent filed an answer (Doc. No. 23) and Petitioner filed a reply (Doc. No. 33). In the reply, Petitioner requests discovery and an evidentiary hearing. (Doc. No. 33 at 45–48.) For the following reasons, these requests will be denied, Petitioner is not entitled to relief on any of his claims, and this action will be dismissed.

**I.      Procedural Background**

In June 2008, a Davidson County grand jury indicted Petitioner for first-degree murder and felony murder. (Doc. No. 22-1 at 5–7.) In July 2009, a jury found Petitioner guilty of second-degree murder, a lesser included offense, on both counts. (Doc. No. 22-2 at 63.) "The jury sentenced him to forty-four years for each conviction. The trial court merged the convictions and ordered that the sentence be served consecutively to a life sentence for a previous conviction." <u>State v. Barrett</u>, No. M2009-02636-CCA-R3-CD, 2012 WL 2870571, at *25 (Tenn. Crim. App. July 13, 2012). The Tennessee Court of Criminal Appeals ("TCCA") affirmed the judgment. <u>Id.</u>

at *46. Petitioner filed an application for permission to appeal to the Tennessee Supreme Court (Doc. No. 22-27), and the Supreme Court denied it on December 12, 2012 (Doc. No. 22-28).

In November 2013, the trial court received Petitioner's *pro se* petition for post-conviction relief. (Doc. No. 22-29 at 66–110.) The court appointed counsel (id. at 111), and Petitioner filed a *pro se* amended petition[1] (id. at 112–30). The court held an evidentiary hearing (Doc. No. 22-31) and denied relief (Doc. No. 22-29 at 134–42). The TCCA affirmed. Barrett v. State, No. M2015-01161-CCA-R3-PC, 2016 WL 4410649 (Tenn. Crim. App. Aug. 18, 2016). Petitioner then filed two applications for permission to appeal: one prepared by counsel (Doc. No. 22-36), and another prepared by Petitioner himself (Doc. No. 22-37). On December 14, 2016, the Tennessee Supreme Court denied discretionary review and dismissed Petitioner's *pro se* application because he was "represented by counsel who filed a timely application for permission to appeal." (Doc. No. 22-38.)

Petitioner filed a habeas corpus petition (Doc. No. 1) and an amended petition (Doc. No. 3) in this Court, and Respondent concedes that the Petition is timely (Doc. No. 23 at 2).

## II.     Factual Background

On direct appeal, the TCCA provided a comprehensive account of the evidence at trial. Barrett, 2012 WL 2870571, at *1–25. The Court will refer to specific evidence as necessary in the analysis below. Here, to provide a basic context for Petitioner's claims, the Court relies on the TCCA's summary of the underlying facts on post-conviction appeal:

> In 2009, the Petitioner was convicted of second degree murder for the February 1975 murder of nine-year-old Marcia Trimble. . . . [O]n the evening of February 25, 1975, the victim left her Nashville home to deliver Girl Scout cookies to a neighbor who lived across the street. When the victim's mother called for her

---

[1] As the TCCA recognized on post-conviction appeal, this amended petition "was not filed by counsel and was submitted by the Petitioner" even though "counsel had been appointed at the time the amended petition was filed." Barrett v. State, No. M2015-01161-CCA-R3-PC, 2016 WL 4410649, at *2 n.1 (Tenn. Crim. App. Aug. 18, 2016). Thus, Petitioner's *pro se* post-conviction petitions were the operative petitions before the trial court.

approximately twenty-five minutes later, the victim did not respond and did not return home.

Following an extensive search, the victim's body was found on March 30, 1975, in a neighbor's garage. The garage where she was found was open-ended without doors, and her body was well-hidden. An autopsy showed that the victim's cause of death was asphyxia caused by manual strangulation. The forensic examiner who performed the autopsy opined that based upon decomposition, livor mortis, and the victim's stomach contents, she died at or near the time of her disappearance and was likely in the garage almost from the time of death.

The medical examiner took vaginal swabs from the victim's vagina, and that evidence was preserved by rolling the swabs onto slides. Subsequent analysis showed the presence of sperm, but DNA testing was not available in 1975. The slides prepared were preserved by the medical examiner's office. The Federal Bureau of Investigation ("FBI") conducted serology testing on the victim's underwear, pants, and blouse. Those tests revealed no blood or semen on the underwear but did show the presence of semen on the pants and blood on the blouse.

The case remained unsolved, but the Metro Nashville Police Department continued to investigate the murder, and in 1990 the victim's case file was reviewed in an attempt to locate evidence that could be submitted for DNA testing. Between 1990 and 2004, the victim's pants, blouse, and the slides created from the vaginal swabs were tested multiple times by various laboratories. A DNA profile from this evidence was created in March 1992. That DNA was compared to samples from over one hundred individuals, including samples from almost everyone in the victim's neighborhood, but there were no matches.

The Petitioner was eventually developed as a suspect, and police obtained a search warrant for his DNA in 2007. The Petitioner's DNA matched a profile developed from the victim's blouse. A DNA expert opined that the probability of a random match was one in six trillion. The Petitioner was subsequently arrested and indicted. In 2008, two jailhouse informants informed authorities that while he was in jail, the Petitioner made statements admitting that he had killed the victim but denying that he had raped her.

Barrett, 2016 WL 4410649, at *1–2 (internal citations and quotation marks omitted).

## III.  Asserted Claims

Petitioner asserts several claims in the original petition and amended petition. Because many of the bare assertions in the original petition overlap with arguments raised in the more expansive amended petition, the Court considers the original and amended petitions collectively.

In doing so, the Court has liberally construed the Petition to the fullest extent to identify the following claims. For clarity, the Court has grouped these claims by type, and listed them in roughly chronological order.

1. The indictment was not issued by a grand jury with a foreman. (Doc. No. 1 at 25; Doc. No. 3 at 33.)

2. The trial court erred in the following eighteen ways:

   2.A. Denying the motion to dismiss for excessive pre-indictment delay (Doc. No. 1 at 12; Doc. No. 3 at 16);

   2.B. Failing to minimize the effect of prejudicial pretrial publicity (Doc. No. 3 at 26–27);

   2.C. Failing to dismiss the indictment based on prejudicial pretrial publicity (id.);

   2.D. Denying the motion to continue trial to allow independent DNA analysis (id. at 10);

   2.E. Denying the motion for a bill of particulars (id. at 20);

   2.F. Denying the motion to suppress (Doc. No. 1 at 10; Doc. No. 3 at 15);

   2.G. Allowing the person who performed the autopsy of the victim to testify as a DNA expert for the prosecution (Doc. No. 1 at 18);

   2.H. Being influenced by media coverage to admit evidence (Doc. No. 3 at 27);

   2.I. Allowing the testimony of "two jailhouse liars" (Doc. No. 3 at 13–14, 23–24);

   2.J. Admitting testimony of Petitioner's statement that he "had killed before" (Doc. No. 1 at 14);

   2.K. Admitting photographs of the victim (Doc. No. 3 at 32–33);

   2.L. Admitting a video recording of a jail altercation involving Petitioner and fellow inmate Frank White, and allowing Sheldon Anter to testify about what White said to Petitioner (Doc. No. 1 at 27; Doc. No. 3 at 14, 28);

   2.M. Failing to tell the jury the court's opinion of who the aggressor was in the jail altercation (Doc. No. 3 at 28);

2.N.    Allowing the prosecution to ask a defense witness if he was arrested, suspended, and resigned from the police force in 1978 (Doc. No. 1 at 15; Doc. No. 3 at 16);

2.O.    Allowing the prosecution to impeach a defense witness with a prior misdemeanor conviction (Doc. No. 1 at 20; Doc. No. 3 at 16);

2.P.    Failing to give a jury instruction on criminal and professional informants (Doc. No. 3 at 17, 23);

2.Q.    Failing to instruct the jury that it must find Petitioner guilty of an underlying felony to find him guilty of felony murder (Doc. No. 3 at 19–21); and

2.R.    Imposing an improper consecutive sentence above the maximum (Doc. No. 1 at 22; Doc. No. 3 at 34).

3.    The state committed prosecutorial misconduct through comments during closing argument. (Doc. No. 1 at 24; Doc. No. 3 at 6, 14, 30–31.)

4.    There is insufficient evidence to support Petitioner's convictions. (Doc. No. 1 at 8; Doc. No. 3 at 14, 22.)

5.    Trial counsel was ineffective in the following fourteen ways:

5.A.    Failing to file a motion to dismiss the indictment due to prejudicial pretrial publicity (Doc. No. 3 at 26);

5.B.    Failing to adequately question potential jurors regarding media coverage (id. at 27);

5.C.    Failing to ask constitutionally required questions during *voir dire* (id. at 33);

5.D.    Retaining DNA expert Ronald Acklen (Doc. No. 3 at 3–4, 6–8);

5.E.    Failing to assess the constitutionality of the collection, testing, and custody of DNA evidence (id. at 3–4, 7);

5.F.    Failing to have a DNA expert conduct an independent DNA test (id. at 4, 9);

5.G.    Failing to request a <u>Dunaway</u> hearing of a second DNA search (id. at 9, 16);

5.H.    Failing to object and move to suppress evidence obtained as a result of a second warrantless DNA search (id. at 15–16);

5.I.    Failing to investigate the backgrounds of state witnesses Sheldon Anter and Andrew Napper (id. at 13);

5.J.      Failing to object to the admission of photographs of the victim from around the time of her death (<u>id.</u> at 33);

5.K.      Failing to object to the prosecutor's playing and narrating a video recording of the jail altercation (<u>id.</u> at 28);

5.L.      Advising Petitioner not to call any alibi witnesses, including an individual named Cicero (<u>id.</u> at 17);

5.M.      Failing to request a jury instruction on criminal and professional informants regarding Anter and Napper (<u>id.</u> at 13–14, 17, 23); and

5.N.      Failing to request a jury instruction on the absentee witness rule regarding Frank White (<u>id.</u> at 25–26).

6.      The Tennessee Supreme Court erred on direct appeal by reversing its decision to allow him a discretionary appeal after a one-week feature on his case aired on local news. (<u>Id.</u> at 27.)

7.      The post-conviction trial court erred in the following eleven ways:

7.A.      Failing to appoint substitute counsel in a timely manner (<u>id.</u> at 28–29);

7.B.      Failing to hear the motion to appoint counsel from outside Nashville (<u>id.</u> at 2, 10);

7.C.      Failing to hear the motion to recuse (<u>id.</u> at 2);

7.D      Failing to hear the motion for independent DNA testing (<u>id.</u> at 2);

7.E.      Failing to hear the motion to move the evidentiary hearing due to media bias (<u>id.</u> at 2);

7.F.      Failing to issue a subpoena to help Petitioner secure witnesses and documentation for the evidentiary hearing (<u>id.</u> at 8, 10, 12);

7.G.      Holding two evidentiary hearings on the same day, five minutes apart (<u>id.</u> at 12);

7.H.      Failing to address the claim that trial counsel should have requested a jury instruction regarding the testimony of Anter and Napper (<u>id.</u> at 24);

7.I.      Failing to address the claim that Petitioner's larceny conviction was void (<u>id.</u> at 18, 20);

7.J.      Ignoring the defense of "selective prosecution" based on differences between DNA samples (<u>id.</u> at 3); and

7.K.    Refusing to provide a copy of the evidentiary hearing transcript (<u>id.</u>).

8.  Appointed post-conviction counsel was ineffective at the initial review stage in failing to:

8.A.    Secure an independent expert's DNA analysis (<u>id.</u> at 5, 9–10);

8.B.    Support Petitioner's *pro se* motion for independent expert assistance (<u>id.</u> at 9, 11); and

8.C.    Arrange for alibi witness Cicero to testify at the evidentiary hearing (<u>id.</u>).

9.  Appointed post-conviction counsel was ineffective on appeal in:

9.A.    Denying Petitioner's right to appeal by refusing to include all the requested grounds for relief in the appellate brief (<u>id.</u> at 10, 13, 30);

9.B.    Failing to provide Petitioner a copy of the evidentiary hearing transcript (<u>id.</u> at 12, 30); and

9.C.    Failing to provide Petitioner a copy of the appellate brief (<u>id.</u> at 12–13, 30).

10. The TCCA erred on post-conviction appeal by failing to address Petitioner's claim that the trial court erroneously allowed Anter's testimony. (<u>Id.</u> at 24–25.)

## IV.   Standard of Review

The authority for federal courts to grant habeas corpus relief to state prisoners is provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>Harrington v. Richter,</u> 562 U.S. 86, 97 (2011). Under AEDPA, a habeas claim "adjudicated on the merits" in state court cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Thus, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."

Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill v. Curtin, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). State-court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Pouncy v. Palmer, 846 F.3d 144, 158 (6th Cir. 2017) (quoting Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was

'based on' that unreasonable determination." <u>Rice v. White</u>, 660 F.3d 242, 250 (6th Cir. 2011)

(citing <u>Byrd v. Workman</u>, 645 F.3d 1159, 1172 (10th Cir. 2011)).

The demanding review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); <u>Harrington</u>, 562 U.S. at 103. In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." <u>Wagner v. Smith</u>, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." <u>Atkins v. Holloway</u>, 792 F.3d 654, 657 (6th Cir. 2015) (citing <u>Jones v. Bagley</u>, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" <u>Middlebrooks v. Carpenter</u>, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing <u>Sutton v. Carpenter</u>, 745 F.3d 787, 790–91 (6th Cir. 2014)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense"— a factor that "cannot be fairly attributed to" the petitioner—"impeded counsel's efforts to comply with the State's procedural rule." <u>Davila</u>, 137 S. Ct. at 2065 (citations omitted). There is also "a

narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392 (2004) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). To establish prejudice, "a petitioner must show not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Garcia-Dorantes v. Warren, 801 F.3d 584, 598 (6th Cir. 2015) (quoting Hollis v. Davis, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted).

## V.     Analysis

Respondent contends that all of the claims in the original petition—and some of the claims in the amended petition—should be dismissed because they do not comply with the pleading requirements of Habeas Rule 2(c). (Doc. No. 23 at 40–42.) Rule 2(c) requires a petitioner to "'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" Mayle v. Fenix, 545 U.S. 644, 655 (2005) (citations omitted). This rule is "more demanding" than Rule 8(a) of the Federal Rules of Civil Procedure, under which "a complaint need only provide 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Mayle, 545 U.S. at 655 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

Here, as stated above, the Court considers the original and amended petitions collectively. Accordingly, although the claims in the original petition are unsupported by facts, and much of the amended petition is difficult to decipher, the Court will not rely on the pleading standard of Habeas Rule 2(c) to summarily deny Petitioner's claims. Instead, the Court will consider whether Petitioner has complied with Rule 2(c), as necessary, in its consideration of each individual claim. See Mayle, 545 U.S. at 656 (explaining that a primary purpose of "Rule 2(c)'s demand that habeas

petitioners plead with particularity is to assist the district court in determining whether" to order the State to respond). Nonetheless, Respondent also contends that Petitioner is not entitled to relief because the claims are either not cognizable, do not survive the demanding review of claims exhausted in state court, or are procedurally defaulted. (Doc. No. 23 at 40.) The Court agrees and addresses each category of claims in turn.

### A.     Non-Cognizable Claims

"Section 2254(a) states that a federal court 'shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Kirby v. Dutton, 794 F.2d 245, 246 (6th Cir. 1986). Thus, federal district courts traditionally grant habeas corpus relief only "when the petitioner is in custody or threatened with custody and the detention is related to a claimed constitutional violation." Id. As explained below, some of Petitioner's challenges to his trial proceedings, direct appeal proceedings, and post-conviction proceedings are outside the scope of federal habeas corpus review for this reason. Id. at 246–47 (discussing Preiser v. Rodriguez, 411 U.S. 475 (1973)) (analyzing the scope of the federal writ of habeas corpus).

### 1.     Claims 2.F, 2.G, 2.I, 2.J, 2.N, 2.O—Trial Proceedings

Petitioner asserts eighteen claims of trial court error. Six are not cognizable. First, Petitioner asserts in Claim 2.F that the trial court erred in denying his motion to suppress. (Doc. No. 1 at 10; Doc. No. 3 at 15.) To provide some context for this claim, Bill Pridemore, a detective assigned to the cold case unit of the Metro Nashville Police Department ("MNPD"), obtained a search warrant for Petitioner's DNA in October 2007. Barrett, 2012 WL 2870571, at *28. Before trial, Petitioner filed a motion to suppress the resulting DNA sample and any test results based on

the sample. (Doc. No. 22-1 at 38–46.) He argued that Pridemore's affidavit accompanying the warrant did not establish probable cause, contained a false statement, and omitted material information. (Id.)

This Court cannot grant "habeas relief based on a state court's failure to apply the exclusionary rule of the Fourth Amendment, unless the claimant shows that the State did not provide him 'an opportunity for full and fair litigation of [his] Fourth Amendment claim.'" Rashad v. Lafler, 675 F.3d 564, 570 (6th Cir. 2012) (quoting Stone v. Powell, 428 U.S. 465, 494 (1976)). An "'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim.'" Good v. Berghuis, 729 F.3d 636, 639 (6th Cir. 2013) (quoting Powell, 528 U.S. at 949).

Here, Petitioner had a full and fair opportunity to present this claim in state court, and, indeed, thoroughly availed himself of that opportunity. He filed a pretrial motion to suppress (Doc. No. 22-1 at 38–52), the court held an evidentiary hearing (Doc. No. 22-3), and the court denied the motion on the merits (Doc. No. 22-1 at 119–26). After trial, Petitioner raised this claim again in a motion for new trial (Doc. No. 22-2 at 70), and the court rejected it (id. at 84). Finally, Petitioner presented this claim on direct appeal (Doc. No. 22-24 at 55–68), and the TCCA thoroughly analyzed it before rejecting it on the merits, Barrett, 2012 WL 2870571, at *27–30. In these circumstances, the denial of Petitioner's motion to suppress is not reviewable in a federal habeas corpus proceeding. See Good, 729 F.3d at 640 (holding that presenting a suppression motion to both the state trial court and the state appellate court "suffices to preclude review of the claim through a habeas corpus petition under Stone v. Powell").

Petitioner's five other non-cognizable claims related to his trial proceedings—Claims 2.G, 2.I, 2.J, 2.N, and 2.O—challenge the state court's application of Tennessee evidentiary rules. A federal habeas court "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." Miskel v. Karnes, 397 F.3d 446, 453 (6th Cir. 2005) (quoting Allen v. Morris, 845 F.2d 610, 614 (6th Cir. 1988)). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." Wilson v. Sheldon, 874 F.3d 470, 475 (6th Cir. 2017) (quoting Coleman v. Mitchell, 244 F.3d 533, 542 (6th Cir. 2001)). "[A]s a general matter, 'state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Id. at 475–76 (quoting Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000)) (internal citation and quotation marks omitted). This "standard for habeas relief is not easily met," id. at 475, and Petitioner does not meet it here.

In Claim 2.G, Petitioner asserts that "the trial court erred in allowing the forensic pathologist who performed the victim's autopsy"—Dr. Jerry Francisco—"to testify as an expert in DNA analysis." (Doc. No. 1 at 18.) When Petitioner raised this claim on direct appeal, the TCCA noted that "the admissibility of opinion testimony of expert witnesses" is governed by Tennessee Rules of Evidence 702 and 703, and that "[q]uestions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court." Barrett, 2012 WL 2870571, at *41 (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263–64 (Tenn. 1997)). The TCCA then carefully analyzed the claim under state law and concluded that the trial court did not abuse its discretion. Id. at *41–43. The asserted failure of the state court to comply

with state law is not subject to federal habeas review.[2] See Peek v. Carlton, No. 3:04-cv-496, 2008 WL 4186939, at *13 (E.D. Tenn. Sept. 5, 2008) (finding that a petitioner's claim regarding "testimony as an expert witness involves the alleged failure of the trial judge to comply with state law and thus is not cognizable in federal habeas proceedings").

Next, Petitioner asserts in Claim 2.I that the trial court erred by admitting the testimony of "two jailhouse liars." (Doc. No. 3 at 13–14, 23.) Here, Petitioner is referring to Sheldon Anter and Andrew Napper, two inmates who were incarcerated with Petitioner and testified as state's witnesses at trial. See Barrett, 2012 WL 2870571, at *12–15. The part of Claim 2.I referring to Napper will be addressed below as a procedurally defaulted claim of trial court error. Infra Section V.C.2. And the part of Claim 2.I referring to Anter is subsumed by the more specific challenge to Anter's testimony in Claim 2.J.

As to Claim 2.J, Petitioner asserts that "the trial court erred in admitting evidence that [he] stated he 'had killed before.'" (Doc. No. 1 at 14.) As background, Sheldon Anter testified regarding conversations he had with Petitioner, as well as an argument between Petitioner and another inmate named Frank White. Barrett, 2012 WL 2870571, at *12–14. Among other things, Anter testified that Petitioner told White he had killed before. Id. at *13. On direct appeal, Petitioner argued that the trial court should have found this testimony to be inadmissible under Tennessee Rule of Evidence 404(b). Id. at *32. The TCCA considered this claim solely under the relevant Tennessee Rules of Evidence and state law and concluded that the trial court did not abuse its discretion in admitting this testimony. Id. at *32–35. Accordingly, the Court will not review Claim 2.J here. See Allen v. Parris, No. 2:15-CV-23-JRG-MCLC, 2018 WL 1595784, at *6–7 (E.D. Tenn. Mar. 30,

---

[2] Moreover, as the TCCA found, this claim is based on a faulty premise. Namely, "Dr. Francisco did not testify as an expert in DNA analysis." Barrett, 2012 WL 2870571, at *42. Instead, "[h]e testified as an expert in forensic pathology, and as part of his expertise as a physician, he described basic scientific knowledge as it related to his laboratory's lack of procedures for preventing contamination of DNA evidence in 1975." Id.

2018) (finding that habeas claim regarding trial court's asserted failure to exclude evidence under Tennessee Rule of Evidence 404(b) did not "state a cognizable basis for § 2254 relief").

In Claim 2.N, Petitioner asserts that "the trial court erred in allowing the State to ask defense witness whether he was arrested, suspended, and had resigned from the police force in 1978." (Doc. No. 1 at 15; Doc. No. 3 at 16.) During trial, the defense called a former MNPD employee named Ewen Robert "Bobby" Downs to testify. Barrett, 2012 WL 2870571, at *22–23. Before cross-examining Downs, the prosecution requested permission at a bench conference to "ask the witness 'if he was suspended from the police department on August 22nd, '78 for lying during a police investigation.'" Id. at *36. Defense counsel objected, and the court ruled this question would be allowed. Id. Petitioner challenged this ruling on direct appeal under Tennessee Rule of Evidence 608, and the TCCA considered this claim under state rules of evidence and state law. Id. at *35–38. The TCCA, in fact, found that "the trial court erred in allowing the State to cross-examine Mr. Downs about the circumstances of his departure from the police force." Id. at *38. But the TCCA did not find that this error "more probably than not affected the judgment" under Tennessee Rule of Appellate Procedure 36(b), and therefore held that Petitioner was not entitled to relief. Id. Petitioner's challenge to the state court's resolution of this claim does not state a claim for federal habeas corpus relief. See Guartos v. Colson, No. 3:12-cv-0048, 2013 WL 247415, at *33 & n.7 (M.D. Tenn. Jan. 23, 2013) (finding that a petitioner's challenge to the state court's application of state evidentiary rules and Tenn. R. App. P. 36(b) did not "state a claim upon which habeas corpus relief can be granted").

Finally, Petitioner asserts in Claim 2.O that "the trial court erred in permitting impeachment of a defense witness with evidence of a misdemeanor conviction." (Doc. No. 1 at 20; Doc. No. 3 at 16.) Another former MNPD employee named Larry Felts testified during Petitioner's

presentation of proof at trial. <u>See</u> <u>Barrett</u>, 2012 WL 2870571, at *23–24. Before Felts testified, the prosecution requested a ruling at a bench conference regarding whether it would be allowed to question him about the circumstances of his departure from the MNPD and about a misdemeanor conviction. <u>Id.</u> at *39. Defense counsel objected, and the court allowed the questions. <u>Id.</u> Petitioner, on direct appeal, argued that this evidence "should have been excluded because it did not qualify for admission under Tennessee Rules of Evidence 608, 609, or 616 and that it was barred by Rule 403." <u>Id.</u> The TCCA concluded that "the trial court did not err in allowing the State to cross-examine Mr. Felts about his conviction and employment termination." <u>Id.</u> at *41. Like the four preceding claims, this claim is not cognizable in a federal habeas corpus proceeding. <u>See</u> <u>Knighton</u> <u>v. Mills</u>, No. 3:07-cv-2, 2011 WL 3843696, at *11–12 (E.D. Tenn. Aug. 29, 2011) (finding that a petitioner's habeas claim challenging the state court's application of Tenn. R. Evid. 609 and state law was "not cognizable").

### 2.      Claim 6—Denial of Permission to Appeal

Petitioner's claim that the Tennessee Supreme Court erred during his direct appeal proceedings is also not reviewable in this case. In Claim 6, Petitioner asserts that the Supreme Court was "intimidated against giving justice to the petitioner's appeal" due to media coverage. (Doc. No. 3 at 27.) That is, Petitioner asserts that the Supreme Court initially granted his application for permission to appeal but changed course after a local news channel aired a one-week feature on his case. (<u>Id.</u>) This claim is without merit for at least two reasons.

First, the Tennessee Supreme Court's decision to deny permission to appeal is not reviewable in a habeas corpus proceeding because Petitioner has not identified an applicable federal right to this discretionary review. <u>See</u> <u>Kirby</u>, 794 F.2d at 246 (holding that district courts typically grant habeas relief only based on "a claimed constitutional violation"). Indeed, the Sixth

Circuit has held that Tennessee's scheme of discretionary Supreme Court review does not conflict with federal law. See Adams v. Holland, 330 F.3d 398, 403 (6th Cir. 2003) (discussing O'Sullivan v. Boerckel, 526 U.S. 838, 847–49 (1999)) ("[T]here is no 'actual conflict' between [Tennessee] Rule [of Appellate Procedure] 39 and federal law.").

Second, this claim has no basis in the record, and appears to arise from Petitioner's improperly conflating this case with his other criminal case from around the same time. In this case—Davidson County Criminal Court Case No. 2008-B-1791—Petitioner was convicted of second-degree murder, and the TCCA affirmed the trial court's judgment on July 13, 2012. Barrett, 2012 WL 2870571, at *1. In another case—Davidson County Criminal Court Case No. 2007-D-3201—Petitioner was convicted of first-degree murder, and the TCCA affirmed the trial court's judgment on July 18, 2012. State v. Barrett, No. M2010-00444-CCA-R3CD, 2012 WL 2914119, at *1 (Tenn. Crim. App. July 18, 2012). As support for Claim 6, Petitioner cites to an unrelated TCCA opinion including a notation that the Tennessee Supreme Court granted discretionary review in his *other* direct appeal. See State v. Keeton, No. M2012-02536-CCA-RM-CD, 2013 WL 1619379 (Tenn. Crim. App. Apr. 16, 2013) (citing Barrett, 2012 WL 2914119). Petitioner does not point to any proof that the Supreme Court ever did so in *this* direct appeal. Accordingly, Petitioner's claim that the Tennessee Supreme Court erred in denying discretionary review of his direct appeal will be denied.

### 3.      Claims 7, 10—Post-Conviction Proceedings

Petitioner's assertions of error by the post-conviction court at the initial review stage and on appeal—Claim 7, its eleven sub-claims, and Claim 10—are "outside the scope of federal habeas corpus review." Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007) (citing Kirby, 794 F.2d at 246–49 and Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002)). A challenge to a state's post-conviction

proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and [] the traditional function of the writ is to secure release from illegal custody." Kirby, 794 F.2d at 247 (quoting Preiser, 411 U.S. at 484). Indeed, the Sixth Circuit has reaffirmed that "attacks on post-conviction proceedings 'address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.'" Leonard v. Warden, Ohio State Penitentiary, 846 F.3d 832, 855 (6th Cir. 2017) (quoting Kirby, 794 F.2d at 247). These claims, accordingly, will be denied.

### 4,    Claims 8, 9—Ineffective Assistance of Post-Conviction Counsel

In Claims 8 and 9, respectively, Petitioner asserts three sub-claims of ineffective assistance against his post-conviction counsel on initial review, and three sub-claims of ineffective assistance against his post-conviction counsel on appeal. These assertions of error are not cognizable as independent habeas claims because they are specifically barred by statute and long-standing precedent.[3] Hodges v. Colson, 727 F.3d 517, 531 (6th Cir. 2013) (citing Martinez v. Ryan, 566 U.S. 1, 17 (2012)) ("28 U.S.C. § 2254(i) bars a claim of ineffective assistance of post-conviction counsel as a separate ground for relief . . . ."); Coleman v. Thompson, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") (citations omitted). Thus, Petitioner's standalone claims challenging the effectiveness of his post-conviction attorneys will be denied.

In some circumstances, however, the ineffective assistance of post-conviction counsel may be used to establish the "cause" necessary to obtain review of a procedurally defaulted claim.

---

[3] The Court also notes that Petitioner's broad assertion, in Claim 9.A, that appellate post-conviction counsel denied his right to appeal is plainly belied by the record. See Barrett, 2016 WL 4410649 (raising three claims on post-conviction appeal).

Martinez, 566 U.S. at 17. This is a narrow rule, subject to several limitations, including that it can only serve as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." Davila, 137 S. Ct. at 2062–63 (discussing Martinez, 566 U.S. 1, and Trevino v. Thaler, 569 U.S. 413 (2013)).

In the reply, Petitioner argues that he can "rely on Martinez and Thaler" because his post-conviction counsel was ineffective and his procedurally defaulted claims "have some merit." (Doc. No. 33 at 4.) Thus, as discussed in more detail below, the Court will consider Petitioner's assertions of post-conviction ineffectiveness as allegations of "cause" regarding his procedurally defaulted claims of ineffective assistance of trial counsel. Infra Section V.C.5.

## B.    Adjudicated Claims

Petitioner exhausted two of his twelve remaining claims of trial court error, and three of his fourteen sub-claims for ineffective assistance of trial counsel.

### 1.    Claim 2.A—Motion to Dismiss Due to Pre-Indictment Delay

Petitioner filed a pretrial motion to dismiss the indictment due to the thirty-three-year delay between the offense and the return of the indictment. (Doc. No. 22-2 at 7–8, 11–15.) The state filed a response. (Id. at 35–37.) The trial court heard oral argument on the motion at a pretrial hearing (Doc. No. 22-6 at 135–38) and denied the motion at the conclusion of argument (id. at 138–39). Petitioner contends that this ruling was in error. (Doc. No. 1 at 12; Doc. No. 3 at 16). He raised this claim on direct appeal, and the TCCA rejected it:

> A criminal defendant has the right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Tennessee Constitution. The delay between the commission of an offense and the initiation of formal proceedings may violate this right to due process. State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996).
>
> In State v. Dykes, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), relying upon United States v. Marion, 404 U.S. 307 (1971), this court stated that "[b]efore an

accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused." In State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997), the Supreme Court acknowledged the "Marion-Dykes" analysis for cases of delay in charging a defendant.

The offense was committed in February 1975, and the victim's body was discovered in March 1975. It is undisputed that DNA technology was not available to the State in 1975. The DNA testing that identified the Defendant took place in 2007. The indictment was returned in June 2008.

We agree with the Defendant that sufficient delay occurred in this case to trigger a due process inquiry. See, e.g., State v. Carico, 968 S.W.2d 280 (Tenn. 1998) (conducting due process inquiry in case involving seven-year delay between offense and arrest); Utley, 956 S.W.2d 489 (five-year delay). Without question, the thirty-three-year delay was lengthy. We do not dispute that in some cases, the passage of this many years may be prejudicial to the defense. The Defendant argues, "[T]he extraordinary delay between the commission of the crime and the return of the indictment rendered all but impossible the Defendant's ability to formulate an alibi defense or produce witnesses or other evidence in his favor." He argues generally that the passage of time may impair the quality and quantity of evidence available and may compromise the reliability of the outcome. We acknowledge that this is a relevant concern. See, e.g., Carico, 968 S.W.2d at 285 n.5. We note that the Defendant has not identified any specific unavailable witness or evidence due to the passage of time, nor is any actual prejudice apparent. We likewise note that the Defendant does not contend that the State intentionally delayed the prosecution in order to obtain a tactical advantage. In fact, the record reflects that the police continued to investigate the crime through the cold case unit and that advances in DNA technology eventually proved fruitful in identifying the Defendant.

The record supports the trial court's determination that the Defendant's due process rights were not violated by the pre-indictment delay. The trial court did not err in denying the motion to dismiss the indictment. The Defendant is not entitled to relief.

Barrett, 2012 WL 2870571, at *31–32.

The TCCA correctly identified the federal standard for this claim, and its application of the

standard was reasonable. "The [United States] Supreme Court recognizes that the Due Process

Clause of the Fifth Amendment protects against oppressive pre-indictment delay." United States

v. Schaffer, 586 F.3d 414, 424 (6th Cir. 2009) (citing Marion, 404 U.S. at 324–25 and United

States v. Lovasco, 431 U.S. 783, 789 (1977)). "A due process claim based on [pre-indictment] prosecutorial delay" requires a two-part inquiry: (1) whether the delay "caused substantial prejudice to [Petitioner's] rights to a fair trial," and (2) whether "the delay was an intentional device to gain tactical advantage over the accused." Brenson v. Coleman, 680 F. App'x 405, 407 (6th Cir. 2017) (quoting Marion, 404 U.S. at 324). "[A] defendant must meet both parts of the test to warrant dismissal of the indictment." United States v. Baltimore, 482 F. App'x 977, 981 (6th Cir. 2012) (citing United States v. Greene, 737 F.2d 572, 574–75 (6th Cir. 1984)).

As to the first prong, "[t]he [United States] Supreme Court has repeatedly emphasized that, in order to establish a due process violation, the defendant must show that the delay 'caused him *actual* prejudice in presenting his defense.'" Schaffer, 586 F.3d at 425 (quoting United States v. Gouveia, 467 U.S. 180, 192 (1984)). The TCCA found that "actual prejudice" was not "apparent," and that Petitioner had "not identified any specific unavailable witness or evidence due to the passage of time." Barrett, 2012 WL 2870571, at *31. Here, Petitioner argues only that "all of his witnesses but one were not able to recall to counsel's satisfaction or were dead." (Doc. No. 3 at 16.) Such general assertions of prejudice are not sufficient to establish a due process violation. See Brenson, 680 F. App'x at 407–08 (denying a petitioner's habeas claim for excessive pre-indictment delay where the state court found that speculative assertions of witnesses' memories fading and unavailability did not establish actual prejudice).

The TCCA likewise found, regarding the second prong, that Petitioner did not even "contend that the State intentionally delayed the prosecution in order to obtain a tactical advantage." Barrett, 2012 WL 2870571, at *31. Petitioner now seems to imply that the delay must have been intentional because DNA testing has been used in Tennessee at least since 1990, and he was not indicted until 2008. (Doc. No. 3 at 16.) This is mere speculation, however, and it is

inconsistent with the record. As the TCCA found, Petitioner's prosecution was the result of continued investigative efforts by the MNPD cold case unit and advancements in DNA technology, and did not involve any intentional delay tactic. Barrett, 2012 WL 2870571, at *31. That is, MNPD personnel took steps to investigate the case after 1990 but did not develop Petitioner as a suspect and obtain a search warrant for his DNA until October 2007. Id. at *11–12, 15. Petitioner was arrested and indicted after the MNPD obtained the results from the testing. Id. at *15. This sequence of events is consistent with due process. See Smith v. Caruso, 53 F. App'x 335, 336–37 (6th Cir. 2002) (citing Lovasco, 431 U.S. at 796) ("Where delay is investigative, rather than intentional in order to gain a tactical advantage, due process principles are not offended . . . .")

In conducting its analysis of this claim, the TCCA recognized that the "thirty-three-year delay" in this case was "lengthy." Barrett, 2012 WL 2870571, at *31. It also acknowledged Petitioner's "relevant concern" that "the passage of time may impair the quality and quantity of evidence available and may compromise the reliability of the outcome." Id. But such general concerns would apply to any prosecution involving a prolonged pre-indictment delay, and the Court simply cannot presume prejudice based on the unavoidable passage of time. The state court thoroughly considered this claim, its reasoning was consistent with clearly established federal law, and the ruling was not based on an unreasonable interpretation of the facts. This claim will be denied.

### 2.    Claim 2.R—Improper Sentence

Next, Petitioner asserts that "the trial court erred in imposing a forty-four-year sentence to be served consecutively to [his] life sentence." (Doc. No. 1 at 22; Doc. No. 3 at 34.) On direct

appeal, he raised the two issues that comprise this claim separately. First, Petitioner argued that

the jury imposed an excessively long sentence. Barrett, 2012 WL 2870571, at *43–44. And second,

he argued that the court erred by "imposing his sentence consecutively to a life sentence for a

previous conviction." Id. at *44–45. Here, Respondent contends that this entire claim is not

reviewable because it challenges a state court's application of state sentencing law. (Doc. No. 23

at 64–65.) While "trial courts have historically been given wide discretion in determining 'the type

and extent of punishment for convicted defendants,'" Austin v. Jackson, 213 F.3d 298, 301 (6th

Cir. 2000) (quoting Williams v. New York, 337 U.S. 241, 245 (1949)), convicted defendants

nonetheless retain a federal "due process right to a fair sentencing procedure." Id. at 300 (quoting

United States v. Anders, 899 F.2d 570, 575 (6th Cir. 1990)). Thus, in an abundance of caution, the

Court will review the TCCA's resolution of this claim. In doing so, however, the Court concludes

that Petitioner is not entitled to relief.

> The TCCA considered and rejected the excessive-sentence argument as follows:

> As noted by the State, second degree murder at the time of the offense carried a
> sentence to prison "for life or for a period of not less than ten (10) years." T.C.A. §
> 39-2408 (1975) (renumbered at T.C.A. § 39-2-212) (repealed 1989); see id.,
> § 40-35-117(c) (2010) (providing that prior law shall apply to sentencing of a
> defendant for a crime committed before July 1, 1982). The law also provided, "The
> jury before whom the offender is tried, shall ascertain in their verdict whether it is
> murder in the first or second degree; and if the accused confess his guilt, the court
> shall proceed to determine the degree of crime by the verdict of a jury, upon the
> examination of testimony, and give sentence accordingly." See id., § 39-2404
> (1975) (amended 1977, 1988) (repealed 1989); see, e.g., State v. Bryant, 805
> S.W.2d 762, 763 (Tenn. 1991). "Until 1982, appellate review of sentencing was
> limited to issues of probation, consecutive sentencing, and capital punishment.
> Where the jury fixed sentences within the range authorized by the criminal statute,
> no appeal was available." Bryant, 805 S.W.2d at 763 (citing Ryall v. State, 321
> S.W.2d 809 (Tenn. 1959); State v. Webb, 625 S.W.2d 281 (Tenn. Crim. App.
> 1980); Johnson v. State, 598 S.W.2d 803 (Tenn. Crim. App. 1980)).

> The Defendant acknowledges that jury-imposed sentences within the range
> prescribed by the former sentencing law normally have not been considered to be
> "excessive or indicative of passion, prejudice, or caprice on the part of the jury."

See Dukes v. State, 578 S.W.2d 659, 666 (Tenn. Crim. App. 1978). He notes that the Tennessee Supreme Court modified sentences involving jury-imposed jail confinement in McKnight v. State, 106 S.W.2d 556 (Tenn. 1937) and Bacon v. State, 385 S.W.2d 107 (Tenn. 1964). We note, however, that both cases cited by the Defendant involved misdemeanors, and distinguish them on that basis. See Bacon, 385 S.W.2d at 270 (identifying "assault and battery" and describing a misdemeanor assault); McKnight, 106 S.W.2d at 557 (identifying unlawfully soliciting insurance as a misdemeanor).

In any event, the Defendant advocates that this court should reduce his sentence to one commensurate to a Range I sentence for second degree murder under current law. He notes that his forty-four year sentence is greater than the maximum sentence for both Range I and Range II sentences for second degree murder under current law. He argues that pursuant to current Code section 39-11-112, he should receive the benefit of the lesser sentence provided for second degree murder by current law. Code section 39-11-112 states:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under the provisions of § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

T.C.A. § 39-11-112 (2010) (emphasis added). Code section 40-35-117 provides that prior law shall apply for all defendants who committed crimes before July 1, 1982. Id., § 40-35-117(c) (2010). This court has said that section 40-35-117 is constitutional. See, e.g., State v. Turner, 919 S.W.2d 346, 361–62 (Tenn. Crim. App. 1995); State v. Melvin, 913 S.W.2d 195, 201–02 (Tenn. 1995).

We conclude that the jury imposed a sentence that was within the applicable range and that the Defendant is not afforded further review by this court. The Defendant is not entitled to relief.

Barrett, 2012 WL 2870571, at *43–44.

As this analysis reflects, the excessive-sentence portion of this claim is essentially an argument that Petitioner should not have been sentenced under the sentencing laws in place at the time of the underlying offense. Under Tenn. Code Ann. § 40-35-117(c), however, "all persons who committed crimes prior to July 1, 1982" are sentenced based on prior law. And the TCCA applied

its prior holding that "section 40-35-117 is constitutional." <u>Barrett</u>, 2012 WL 2870571, at *44. In

doing so, the TCCA cited <u>State v. Turner</u>, 919 S.W.2d 346 (Tenn. Crim. App. 1995), where that

court explained as follows:

> The Tennessee General Assembly has the exclusive authority to designate what conduct is prohibited and the punishment for that conduct. As a corollary, the General Assembly had the authority to provide that crimes committed prior to July 1, 1982, would be exempted from both the 1982 and the 1989 Acts. Moreover, the General Assembly did not violate any constitutional right guaranteed to the appellant, or any other citizen, by exempting crimes committed prior to July 1, 1982, from both Acts.
>
> Whether this Court makes an analysis based upon the strict scrutiny test, as the appellant suggests, or the rational basis test, as the state suggests, the results will be the same. The appellant's right to Due Process was not violated by the imposition of a sentence based upon the law and punishment that existed when he committed the offense.

919 S.W.2d at 362. Petitioner has not demonstrated that the TCCA's determination of this

excessive-sentence issue was objectively unreasonable, or contrary to clearly established federal

law. <u>See</u> <u>Frazier v. Fortner</u>, No. 1:09-cv-00016, 2011 WL 4402959, at *4–7 (M.D. Tenn. Sept. 21,

2011) (finding that the TCCA's application of Tenn. Code Ann. § 40-35-117(c) "did not violate

the Ex Post Facto clause nor any due process rights of the Defendant under any clearly established

Supreme Court precedents at the time of his sentencing"). Petitioner is not entitled to relief on this

ground.

The state court's determination of the consecutive-sentence portion of Petitioner's

sentencing claim was also reasonable. The TCCA analyzed this portion as follows:

> Before considering the issue raised, we note that at the Defendant's request, the trial court considered consecutive sentencing of the Defendant under current Code section 40-35-115. That statute was not in effect at the time of the Defendant's crime. At that time, the Code provided:
>
> > When any person has been convicted of two (2) or more offenses, judgment shall be rendered on each conviction after the first, providing that the terms of imprisonment to which such person is

sentenced shall run concurrently or cumulatively in the discretion of the trial judge; provided, that the exercise of the discretion of the trial judge shall be reviewable by the Supreme Court on appeal.

T.C.A. § 40-2711 (1975) (amended 1979) (repealed 1982). As we noted in Section VIII, the current Criminal Code provides that prior law shall apply for all defendants who committed crimes before July 1, 1982. See id., § 40-35-117(c). The proper law for determining whether the Defendant should receive a consecutive sentence was the law as it existed in 1975.

In that regard, the Defendant's crime was committed before our Supreme Court's decisions in Gray v. State, 538 S.W.2d 391 (Tenn. 1976) and State v. Taylor, 739 S.W.2d 227 (Tenn. 1987). Those cases established the framework that was adopted by our legislature in defining the current consecutive sentencing scheme. See generally T.C.A. § 40-25-115, Sent'g Comm. Cmts. Collectively, Gray and Taylor defined five categories of offenders for whom consecutive sentencing was appropriate. See id. The legislature added two additional categories in 1990. Id. Before the Gray and Taylor decisions, there was no guidance for a trial court in imposing consecutive sentencing. See Gray, 538 S.W.2d at 392–93 (noting the absence of guidelines for determining when consecutive sentencing was appropriate and defining guidelines to be followed in the future); see also Bundy v. State, 140 S.W.2d 154 (Tenn. 1940) (stating that consecutive sentencing was in the discretion of the trial court); Wooten v. State, 477 S.W.2d 767, 768 (Tenn. Crim. App. 1971).

All of that said, the development of the law is of little consequence to the outcome of this case. Use of the subsequently developed guidelines only reinforces that the trial court did not abuse its discretion. In the present case, the trial court found two bases for imposing consecutive sentencing. First, the court found that the Defendant's history of criminal activity was extensive. See Gray, 538 S.W.2d at 393. The record reflects that the Defendant had prior convictions for first degree murder, rape, unlawful carnal knowledge of a minor, and assault with intent to rape. This was an appropriate consideration that was within the discretion of the trial court, without regard to the timing of the Gray decision. The trial court did not abuse its discretion in imposing consecutive sentencing on this basis.

Second, the trial court found that the Defendant was a dangerous offender with little or no regard for human life and who had no hesitation about committing a crime involving a high risk to human life. See id. With regard to this finding, the court noted that the sentence "need[ed] to be long enough to keep [the Defendant] permanently incarcerated" and that an extended sentence would minimize the deaths of the victim and the murder victim from the previous case.[4] See id.; see also State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). Again, this was an appropriate

_____

[4] To be clear on this point, the trial court found that Petitioner must serve this sentence consecutively to a previously imposed sentence, in part, because "[t]o do otherwise would minim[ize] the death[s] of" the victims in each case. (Doc. No. 22-21 at 13.)

26

consideration for the trial court to have considered. The trial court did not abuse its discretion in relying on this basis to impose consecutive sentences.

Barrett, 2012 WL 2870571, at *44–45.

Here, Petitioner contests only the first factor relied on by the trial court—that he had an extensive history of criminal activity. As the TCCA observed, at the time of sentencing in this case, Petitioner "had prior convictions for first degree murder, rape, unlawful carnal knowledge of a minor, and assault with intent to rape." Barrett, 2012 WL 2870571, at *45. Petitioner does not dispute the fact of these convictions. Instead, he seems to argue that these convictions should not have been used to impose a consecutive sentence because the offenses occurred "less than one month apart" and "were all over thirty (30) years old" at sentencing. (Doc. No. 3 at 34.) Petitioner has not, however, cited any clearly established federal law to support this argument. The TCCA explained that "the proper law for determining whether the Defendant should receive a consecutive sentence was the law as it existed in 1975," and that the imposition of consecutive sentences, at that time, was entirely within the trial court's discretion. Barrett, 2012 WL 2870571, at *45 (citations omitted). The United States Supreme Court has recognized this sentencing scheme as constitutional. See Oregon v. Ice, 555 U.S. 160, 163–64 (2009) (noting that states "entrust[ing] to judges' unfettered discretion the decision whether sentences for discrete offenses shall be served consecutively or concurrently" do not "transgress[] the Sixth Amendment"). The consecutive sentence portion of this claim, therefore, is without merit.

Because the state court's determination of Petitioner's sentencing claim was neither contrary to nor an unreasonable application of clearly established federal law, Claim 2.R will be denied.

### 3.      Claims 5.D, 5.F, 5.L—Ineffective Assistance of Trial Counsel

The Court now turns to Petitioner's exhausted sub-claims of ineffective assistance of trial counsel. On post-conviction appeal, Petitioner asserted that trial counsel was ineffective for failing to: (1) timely request independent DNA testing; (2) call a DNA expert; and (3) call an alibi witness. Barrett, 2016 WL 4410649, at *1. Here, Petitioner does not raise the first and second sub-claims verbatim. Nonetheless, as explained in more detail below, the Court liberally construes Claims 5.F and 5.D, respectively, to be exhausted through the first and second sub-claims raised on post-conviction appeal. Meanwhile, Petitioner clearly exhausted Claim 5.L by asserting that trial counsel was ineffective for failing to call an alibi witness.

The federal law governing the adequacy of a criminal defendant's representation is defined in Strickland v. Washington, 466 U.S. 668 (1984). Premo v. Moore, 562 U.S. 115, 121 (2011). The TCCA correctly identified and set forth the Strickland standard before considering Petitioner's ineffective-assistance claims on the merits. Barrett, 2016 WL 4410649, at *4–5.

Under Strickland, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (citing Strickland, 466 U.S. at 687). Trial counsel's performance is deficient where it falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "[A] court deciding an ineffective assistance claim" need

not "address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Id.</u> at 697.

When a petitioner raises an exhausted ineffective-assistance claim in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below <u>Strickland</u>'s standard," but "whether the state court's application of the <u>Strickland</u> standard was unreasonable." <u>Harrington</u>, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011)). That is because, under Section 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 410). Accordingly, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself." <u>Id.</u>

Here, in Claim 5.F, Petitioner asserts that trial counsel was ineffective for failing to have an expert conduct independent DNA testing. (Doc. No. 3 at 9–10.) As background for this sub-claim, Petitioner's counsel filed a motion to continue trial on June 30, 2009, to allow adequate time to obtain independent DNA testing. (Doc. No. 22-2 at 21–23.) At that time, trial was set to begin on July 13, 2009. (<u>Id.</u> at 21.) The court denied the motion, stating that counsel had "known about the DNA for 11 months." (Doc. No. 22-5 at 111–12.) On post-conviction appeal, Petitioner argued that "trial counsel was deficient for failing to make a timely request for independent DNA analysis." <u>Barrett</u>, 2016 WL 4410649, at *5. While Claim 5.F does not specifically question the timing of counsel's request, it raises the same issue as on post-conviction appeal: counsel's failure to ensure that an expert conducted independent DNA testing before trial. Thus, the Court liberally construes Claim 5.F to have been exhausted on post-conviction appeal.

The TCCA rejected this sub-claim as follows:

> [T]he Petitioner contends that trial counsel was deficient for failing to make a timely request for independent DNA analysis. The Petitioner asserts that if "independent testing [had] been requested at an earlier and more reasonable time the request might have been granted." However, the Petitioner failed to introduce any results of independent testing at the hearing in support of his claim and offered no explanation as to how he was prejudiced by the absence of independent DNA testing.
>
> At the evidentiary hearing, trial counsel testified that after consulting with Dr. Acklen, he determined that independent testing was not necessary. Dr. Acklen opined to counsel that he agreed with the conclusions reached by the State's experts. Additionally, Dr. Acklen advised trial counsel about particular areas of cross-examination. Counsel admitted at the hearing that "[i]n retrospect" he wished that he had requested independent testing earlier, mostly because it was something that the Petitioner wanted. However, when reviewing an attorney's conduct in the post-conviction context, "a fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Likewise, deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Trial counsel made a decision not to request independent testing based on his consultation with an expert and subsequent conclusion that additional testing would not be helpful. Although he expressed regret in hindsight that he did not request independent testing, we conclude that at the time, he made a reasonable strategic decision not to request independent testing earlier in the case. Accordingly, the Petitioner has not proven that counsel rendered deficient performance, and he is not entitled to relief.

Barrett, 2016 WL 4410649, at *5–6.

It was reasonable for the state court to determine that counsel did not perform deficiently in deciding not to obtain independent DNA testing prior to trial. As the TCCA noted, counsel's decision was based on his consultation with Dr. Ronald Acklen, a DNA expert. Counsel testified at the evidentiary hearing that Dr. Acklen reviewed all of the laboratory reports, notes, and procedure manuals related to the DNA testing in this case. (Doc. No. 22-31 at 63–64.) "Counsel and Dr. Acklen discussed the 'methodology and procedure' utilized by the various laboratories involved in the DNA analyses," and Dr. Acklen informed counsel that he agreed with the

assessments reflected in the state's reports. <u>Barrett</u>, 2016 WL 4410649, at *4. Based on Dr. Acklen's opinion, counsel decided that it was unnecessary to obtain independent testing.

Counsel's expression of regret at the evidentiary hearing regarding this decision was clearly based on Petitioner's desire, not his own. (Doc. No. 22-31 at 66 ("In light of the fact that [Petitioner] wanted it done and we were unable to achieve that, I wish that I had done it sooner.").) Even so, "[u]nder <u>Strickland</u>, courts give little weight to counsel's hindsight assessment of [his] trial actions." <u>O'Neal v. Burt</u>, 582 F. App'x 566, 573–74 (6th Cir. 2014) (collecting cases); <u>see also</u> <u>Tyler v. Ray</u>, 610 F. App'x 445, 449 (6th Cir. 2015) ("The question under <u>Strickland</u> is not what the reviewing judge would have done in hindsight, or even what the attorney himself would have done in hindsight."). Counsel's decision not to obtain independent DNA testing before trial was an informed one, "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. Applying the "doubly deferential" standard of review for exhausted claims of ineffective assistance of counsel, the Court concludes that the state court was not unreasonable in determining that counsel was not deficient.

The TCCA's finding that Petitioner failed to demonstrate prejudice resulting from the failure to obtain independent DNA testing was also not unreasonable. The TCCA pointed out that Petitioner did not "introduce any results of independent testing at the hearing in support of his claim and offered no explanation as to how he was prejudiced by the absence of independent DNA testing." <u>Barrett</u>, 2016 WL 4410649, at *5. Here, Petitioner blames this failure on the post-conviction trial court's refusal to consider *pro se* motions seeking independent DNA analysis,[5] documents, and witnesses. (Doc. No. 3 at 10–12.) Petitioner also lays this failure at the feet of

---

[5] The Court notes that, while there is not a record of the post-conviction court's formally ruling on Petitioner's request for independent DNA analysis, the court did find that it "heard no evidence" to support Petitioner's claim that "the DNA tests were unreliable, prejudicial, and unscientific." (Doc. No. 22-29 at 140.)

post-conviction counsel for inadequately assist him. (Id. at 9–10, 12.) But, as the Court explained in denying Petitioner's claims of error by the post-conviction trial court, supra Section V.A.3, "[e]rrors or deficiencies in post conviction proceedings are not properly considered in habeas corpus proceedings." Hayden v. Warden, Marion Corr. Inst., No. 2:15-cv-2927, 2016 WL 2648776, at *3 (S.D. Ohio May 10, 2016) (collecting cases). And there is no constitutional "right to the effective assistance of postconviction counsel." Stojetz v. Ishee, 389 F. Supp. 2d 858, 889 (S.D. Ohio 2005); see also Gerth v. Warden, Allen Oakwood Corr. Inst., 938 F.3d 821, 830 (6th Cir. 2019) (quoting Coleman, 501 U.S. at 752) ("The Supreme Court has explained that a defendant has 'no constitutional right to an attorney in state post-conviction proceedings' and therefore 'cannot claim constitutionally ineffective assistance of counsel in such proceedings.'").

"A federal habeas court's review of 'any claim that was adjudicated on the merits in State court proceedings' is limited to the evidence presented in the state proceeding." Smith v. Carpenter, No. 3:99-cv-0731, 2018 WL 317429, at *4 (M.D. Tenn. Jan. 8, 2018) (citing Pinholster, 563 U.S. at 181–82). Here, regardless of Petitioner's current complaints, the fact remains that Petitioner failed to present evidence in his post-conviction proceedings that the absence of independent DNA testing prejudiced him. Thus, the state court's determination to this effect was not unreasonable.

The TCCA's reasonably determined that Petitioner failed to demonstrate both deficiency and prejudice as to counsel's failure to obtain independent DNA testing before trial. Claim 5.F, therefore, will be denied.

Next, in Claim 5.D, Petitioner seems to assert that trial counsel was ineffective for retaining an insufficient DNA expert. (Doc. No. 3 at 3–4.) As noted above, trial counsel consulted with DNA expert Dr. Acklen before trial. On post-conviction appeal, Petitioner contended that "trial

counsel was ineffective for not calling a DNA expert to testify for the defense." Id. at *5. Here, Petitioner argues that Dr. Acklen did not have the "scientific objectivity" necessary to "independently assess" the DNA state's reports and "advise defense counsel as to the reliability and admissibility of the DNA evidence in the case." (Doc. No. 3 at 3.) The implication of this argument is that, if Dr. Acklen was sufficiently competent, he would have identified deficiencies with the state's DNA reports, advised counsel to that effect before trial, and testified to that effect during trial. Accordingly, the Court liberally construes Claim 5.D to have been exhausted through Petitioner's second sub-claim on post-conviction appeal.

The TCCA essentially found that Petitioner failed to demonstrate that he was prejudiced by trial counsel's retaining an allegedly inadequate DNA expert. Barrett, 2016 WL 4410649, at *5. That is, because Petitioner "failed to produce the testimony of a DNA expert at the hearing," the TCCA held, it could not "assess what impact" a DNA expert's testimony "would have had at trial." Id. (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). As explained above, counsel did not call a DNA expert to testify at trial because Dr. Acklen concurred with the conclusions of the state's DNA reports. Petitioner now disagrees with Dr. Acklen's assessment, reasoning that Dr. Acklen must have lacked the "scientific objectivity" necessary to render an adequate opinion. But without the testimony of either Dr. Acklen or another DNA expert at the post-conviction evidentiary hearing, the TCCA had no basis to conclude that Dr. Acklen's opinion was flawed in some way. Again, while Petitioner blames post-conviction counsel for the failure to present this evidence, the Court must consider only the evidence actually presented. See Smith, 2018 WL 317429, at *4 (citing Pinholster, 563 U.S. at 181–82). In doing so, the Court concludes that it was not unreasonable for the TCCA to find that Petitioner failed to demonstrate prejudice resulting from counsel's use of Dr. Acklen as a DNA expert.

The TCCA did not make a finding on whether counsel was deficient in retaining Dr. Acklen. "When a state court relied only on one Strickland prong to adjudicate an ineffective assistance of counsel claim," the Court reviews the unadjudicated prong *de novo*. Rayner v. Mills, 685 F.3d 631, 638 (6th Cir. 2012). Here, the Court concludes that Petitioner has not demonstrated deficiency under this standard.

Counsel testified at the evidentiary hearing that he had worked with Dr. Acklen before and that he hired Dr. Acklen through Tennessee's Administrative Office of the Courts. (Doc. No. 22-31 at 63.) Under Tennessee Supreme Court Rule 13, Section 5(b)(2)(B), in order to obtain Dr. Acklen's expert services in this case, counsel had to file a motion including information about Dr. Acklen's qualifications and licensure status. The trial judge signed an *ex parte* order authorizing this expenditure. (Doc. No. 22-31 at 63.) Counsel then ensured that Dr. Acklen received all of the laboratory reports, notes, and procedure manuals provided by the state. (Id.) Although Petitioner now takes issue with Dr. Acklen's assessment of this information, he does so only by presenting scattershot assertions of error in the state's DNA reports. (See Doc. No. 3 at 3–4, 6–8, 9.) Petitioner does not assert that counsel had any reason to doubt Dr. Acklen's qualifications prior to consulting with him, or that Dr. Acklen has since suffered some professional disrepute. Petitioner's conclusory assertion of ineffectiveness does not overcome the strong presumption that counsel performed adequately in retaining Dr. Acklen. See Burt, 571 U.S. at 23 (citing Strickland, 466 U.S. at 690) ("Counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'").

In sum, the Court concludes that the TCCA's application of Strickland to the prejudice prong of this claim was not unreasonable, and Petitioner has not demonstrated deficiency under a *de novo* review. Claim 5.D will be denied.

Finally, in Claim 5.L, Petitioner asserts that trial counsel was ineffective for advising him not to call any alibi witness, including an individual named Cicero who would have testified that Petitioner was in Chicago, Illinois at the time of the murder. (Doc. No. 3 at 17.) The TCCA rejected this sub-claim:

> According to the Petitioner, Cicero would have testified that he was in Chicago on the day that the victim disappeared. In order to satisfy the prejudice prong of Strickland when alleging that trial counsel was ineffective for failing to investigate or call witnesses, a petitioner must "show that through reasonable investigation, trial counsel could have located the witness . . . and . . . elicit[ed] both favorable and material testimony from the witness." State v. Denton, 945 S.W.2d 793, 802–03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). When a petitioner claims that trial counsel was ineffective for failing to call witnesses, the only way he can prove prejudice is by producing the testimony of those witnesses at the evidentiary hearing. See Black, 794 S.W.2d at 757.

> Although the Petitioner and trial counsel testified that Cicero recalled the Petitioner's being in Chicago on the day of the victim's disappearance, Cicero was not called as a witness at the evidentiary hearing. Consequently, it is unclear what Cicero would have actually testified to and what impact, if any, that testimony would have had on the outcome of trial. Accordingly, the Petitioner has not shown prejudice, and he is not entitled to relief.

Because Petitioner did not call Cicero at the evidentiary hearing to clarify what he would have actually testified to at trial, the state court's determination that he failed to demonstrate prejudice on this sub-claim is not objectively unreasonable. See Hutchison v. Bell, 303 F.3d 720, 748–49 (6th Cir. 2002) (citations omitted) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."). Moreover, the evidentiary hearing testimony of Petitioner and trial counsel reflects that counsel was not deficient. Regarding Cicero, Petitioner testified as follows:

> Cicero suffered from serious medical issues and was an ex-convict. According to the Petitioner, counsel did not want to call Cicero because he did not believe Cicero would be an effective witness, which counsel discussed with the Petitioner.

Ultimately, Cicero was not called as an alibi witness, a decision that the Petitioner admitted he agreed with at the time, noting that he "trusted [counsel's] judgment." In retrospect, however, the Petitioner said that "even a little bit might have been better than none" because Cicero was the only person who remembered his being in Chicago on the day the victim went missing.

Barrett, 2016 WL 4410649, at *2. Trial counsel also testified as follows:

Trial counsel . . . agreed that he and the Petitioner discussed an alibi defense early in the case. Counsel said that he worked with a defense investigator, Amber Cassitt, and that he gave her the list of potential alibi witnesses and asked her to meet with the Petitioner to discuss details of the alibi and then to meet with as many people on the list as possible. According to trial counsel, Ms. Cassitt spent a "substantial amount of time" attempting to locate these potential witnesses. Trial counsel said that Ms. Cassitt was able to locate about half of the individuals named by the Petitioner, but some of them did not remember the Petitioner. Two people remembered the Petitioner and "thought that it was likely that he would have gone [to Chicago] because he was active in [the] [Nation of Islam] community at that time." However, Cicero was the only person who "specifically" told Ms. Cassitt that he recalled the Petitioner's being in Chicago on the relevant date.

According to trial counsel, Cicero was not actually located until closer to the trial date. Counsel decided to file a notice of alibi and then he and the Petitioner "had further discussion about whether . . . [Cicero] would be a good witness in terms of credibility issues." Trial counsel said that he stood by his decision not to call Cicero as a witness, saying that if there had been "stronger means to prove that [the Petitioner] was in Chicago," trial counsel would have presented that evidence. However, trial counsel opined that the alibi evidence they had was not strong, and he ultimately concluded that "putting out a weak alibi was worse than putting on no proof at all."

Id. at *3.

"[D]eciding which witnesses to present at trial is a matter of strategy." Yancey v. Haas, 742 F. App'x 980, 984 (6th Cir. 2018) (citations omitted). And Petitioner "must overcome the presumption that" his counsel's decision not to call Cicero as an alibi witness "might be considered sound trial strategy." Strickland, 688 U.S. at 689 (citing Michel, 350 U.S. at 101). Petitioner's counsel testified that he considered presenting an alibi defense, investigated potential alibi witnesses, and concluded that Cicero—the only potential alibi witness—was not a strong enough witness to carry an alibi defense without additional evidence corroborating his testimony. In

counsel's judgment, "putting out a weak alibi was worse than putting on no proof at all." Barrett, 2016 WL 4410649, at *3. And as the TCCA noted, Petitioner agreed with this judgment at the time; only later, during his post-conviction evidentiary hearing, did Petitioner state that "in retrospect, . . . even a little bit might have been better than none." (Doc. No. 22-31 at 11.) Petitioner's purely speculative, retrospective disagreement with counsel's judgment goes against Strickland's instruction to "eliminate the distorting effect of hindsight" when assessing an attorney's performance. 466 U.S. at 689. The Court concludes that, in these circumstances, counsel's decision not to call an alibi witness was not deficient performance. Having failed to demonstrate both deficiency and prejudice on this sub-claim, Petitioner is not entitled to relief.

## C.     Procedurally Defaulted Claims

Petitioner's remaining claims will be denied as procedurally defaulted without cause. This includes a defective-indictment claim, several claims of trial court error, a claim of prosecutorial misconduct, an insufficient-evidence claim, and various sub-claims of ineffective assistance of trial counsel.

### 1.     Claim 1—Defective Indictment

Petitioner asserts, without elaboration or explanation, that the indictment is unconstitutional because it was issued by a grand jury that did not appoint a foreman. (Doc. 1 at 25; Doc. No. 3 at 33.) Petitioner did not present this claim to the TCCA on direct appeal. He did raise this claim in his original *pro se* post-conviction petition (Doc. No. 22-29 at 80), and the trial court squarely rejected it (id. at 138). Petitioner did not, however, present this claim to the TCCA on post-conviction appeal. Thus, Petitioner did not fully exhaust his available remedies in the state courts, and he is now barred from doing so by Tennessee Rule of Appellate Procedure 4, Tennessee's one-year statute of limitations for post-conviction petitions, and Tennessee's "one-

petition" limitation on post-conviction relief. Tenn. Code Ann. §§ 40-30-102(a), (c). This claim is procedurally defaulted.

Petitioner generally argues that his failure to present claims to the TCCA on post-conviction appeal was due to ineffective assistance. (See Doc. No. 3 at 10, 13, 30 (asserting that post-conviction appellate counsel was ineffective in failing to include requested grounds for relief in the appellate brief).) But Petitioner cannot rely on this argument to establish the cause required to overcome this claim's default because it is not a claim of ineffective assistance of trial counsel. See Davila, 137 S. Ct. at 2062–63 (citations omitted). Accordingly, Claim 1 is not subject to further review.[6]

### 2.      Trial Proceedings

Petitioner's remaining claims of trial court error concern four subjects—media attention, pretrial motions, the admission of evidence, and jury instructions.

### a.      Claims 2.B, 2.C, 2.H—Media Attention

First, in Claim 2.B, Petitioner asserts that the trial court failed in its "affirmative constitutional duty to minimize the effect of prejudicial pretrial publicity." (Doc. No. 3 at 26.) Relatedly, Claim 2.C asserts that the court should have dismissed the indictment before trial due to this publicity. (Id.) And in Claim 2.H, Petitioner asserts that the court improperly admitted evidence during trial due to media coverage. (Id.)

Petitioner raised Claim 2.B in his motion for new trial (Doc. No. 22-2 at 75), the trial court rejected it (Doc. No. 22-29 at 138), and Petitioner did not present it to the TCCA on direct appeal. Nor did he raise Claim 2.C or 2.H at that stage. Later, through his *pro se* post-conviction petitions, Petitioner asserted all three claims. (Doc. No. 22-29 at 91–94, 115–16.) The trial court found that

---

[6] The Court also notes that this claim appears to be baseless on the merits because the indictment bears the signature of a foreperson and reflects that it is a true bill. (Doc. No. 22-1 at 5.)

Petitioner did not present any evidence that "the pre-trial publicity and media coverage of the trial denied [him] due process of law and a fair trial." (Id. at 140.) Then, Petitioner did not raise Claim 2.B, 2.C, or 2.H on post-conviction appeal. In short, Petitioner did not exhaust the available remedies for these three claims by presenting them to the TCCA, and he can no longer do so. He has not demonstrated cause to overcome this default. These claims will be denied.[7]

### b.      Claims 2.D, 2.E—Pretrial Motions

Second, Petitioner takes issue with the trial court's denial of certain pretrial motions. Specifically, Claim 2.D pertains to Petitioner's motion to continue trial to allow independent DNA analysis (Doc. No. 3 at 10), and Claim 2.E addresses his motion for a bill of particulars. (Id. at 20.) Petitioner raised both claims in a motion for new trial (Doc. No. 22-2 at 70, 73), and the trial court denied each one (id. at 84, 85). Petitioner did not then present these claims to the TCCA on either direct or post-conviction appeal. Thus, Petitioner did not fairly present Claims 2.D and 2.E to the state courts, and he has not shown cause to overcome this default. These two claims are not subject to further review.

### c.      Claims 2.I, 2.K, 2.L, 2.M—Admission of Evidence

Third, Petitioner takes issue with the admission of certain evidence at trial. Claim 2.I challenges the trial court's admission of testimony from two different witnesses—Sheldon Anter and Andrew Napper. (Doc. No. 3 at 13–14, 23–24.) As explained above, supra Section V.A.1, the Anter portion of this claim is not cognizable in this federal habeas proceeding because Petitioner

---

[7] As part of these claims, Petitioner complains that changing the trial venue to Chattanooga was "a farce" because "the media there had begun to crank up their publicity before the jury was picked, which allowed for such media sensationalizing to infect the whole trial." (Doc. No. 3 at 27.) Here, as in Claim 6, it appears that Petitioner is incorrectly referring to another case he faced around the same time as this one. Petitioner is currently challenging the judgment in Case No. 2008-B-1791. (Doc. No. 1 at 1.) This trial was held in Nashville. (See Doc. No. 33 at 39–40 (Petitioner's reply reflecting that trial was held in Nashville).) The trial for Petitioner's other case was apparently held in Chattanooga. (See Doc. No. 22-31 at 18–19, 48–49 (Petitioner's testimony from the evidentiary hearing on his post-conviction petition regarding the venue for these two trials).)

raised it on direct appeal solely as a matter of state evidentiary law. As to the Napper portion of this claim, however, Petitioner did not raise it on direct appeal at all. While Petitioner expressed displeasure with Napper's testimony in his *pro se* post-conviction petition, he did so under the umbrella of prosecutorial misconduct. (See Doc. No. 22-29 at 83–84.) Regardless, the trial court denied the claim (Doc. No. 22-29 at 139), and Petitioner did not present it to the TCCA on post-conviction appeal.

Although Petitioner did raise this claim in a conclusory fashion in his *pro se* application for permission to appeal to the Tennessee Supreme Court in his state post-conviction proceedings (Doc. No. 22-37 at 7), that is not sufficient to fairly present the claim to the state courts. "[W]here a habeas petitioner had the opportunity to raise a claim in the state courts on direct appeal but only raised it for the first time on discretionary review, such a claim is not fairly presented." Thompson v. Bell, 580 F.3d 423, 438 (6th Cir. 2009) (discussing Castille v. Peoples, 489 U.S. 346, 351 (1989)). That is the case here, as Petitioner failed to raise this claim prior to his request for discretionary Supreme Court review. Because Petitioner has not demonstrated cause for this failure, the Napper portion of claim 2.I will be denied as procedurally defaulted.

As to Claim 2.K, Petitioner asserts that the trial court erred in admitting two photographs of the victim from around the time of her death because they were unduly prejudicial. (Doc. No. 3 at 32–33.) But Petitioner did not present this claim to the TCCA on either direct or post-conviction appeal. And raising this claim in his request for discretionary Supreme Court review of his post-conviction proceedings (see Doc. No. 22-37 at 31) is not sufficient to exhaust it, because that is not a "procedural context in which . . . the merits [of a claim] are considered as of right." Olson v. Little, 604 F. App'x 387, 402 (6th Cir. 2015) (discussing Castille, 489 U.S. 346; see also Smith v. Parker, No. 10-1158-JDB-egb, 2013 WL 5409783, at *30 (W.D. Tenn. Sept. 25, 2013) (applying

Castille and concluding that a petitioner does not fairly present a claim to the state courts by raising it in an application for permission to appeal to the Tennessee Supreme Court). This claim is procedurally defaulted without cause.

In Claim 2.L, Petitioner asserts that the trial court erred in admitting a video recording of an altercation in the jail between Petitioner and fellow inmate Frank White, and allowing Sheldon Anter to testify about what White said to Petitioner. (Doc. No. 1 at 27; Doc. No. 3 at 14, 28.) As context for this claim, Anter testified that White called Petitioner a "baby killer and a rapist" immediately before this altercation. (Doc. No. 22-13 at 38–41.) On direct appeal, Petitioner did not raise any claim about the admissibility of this recording, or Anter's testimony about White's remarks. Petitioner did raise this claim in his *pro se* post-conviction petition (Doc. No. 22-29 at 100–03), and the trial court denied it (id. at 141). Petitioner did not then appeal this claim to the TCCA. Because Petitioner did not fairly present this claim to the state courts, he can no longer do so, and he has not demonstrated cause for this default, Claim 2.L will be denied

Petitioner's other claim related to this video recording will be denied as well. In Claim 2.M, Petitioner asserts that the judge erred by failing to do what he told the jury he would do— view the video overnight and tell the jury his opinion of who the aggressor was the next day. (Doc. No. 3 at 28.) This claim will be denied as procedurally defaulted without cause because Petitioner did not present it to the TCCA at any point.[8]

### d.    Claims 2.P, 2.Q—Jury Instructions

The final category of procedurally defaulted claims of trial court error relates to jury instructions. In Claim 2.P, Petitioner asserts that the court erred by failing to instruct the jury on criminal and/or professional informants in connection with the testimony of Sheldon Anter and

---

[8] Based on the trial transcript, it also does not appear that the judge made any statement to the jury like the one alleged in this claim in the first place.

Andrew Napper. (Doc. No. 3 at 17, 23–24.) And in Claim 2.Q, Petitioner asserts that the court should have instructed the jury that a finding of guilt for the charge of felony murder required a finding of guilt on an underlying felony. (Id. at 17–21.)

Petitioner did not present either jury-charge claim to the TCCA on direct or post-conviction appeal. He did raise these two claims in his *pro se* application for permission to appeal in his post-conviction proceedings (Doc. No. 22-37 at 19, 34), but, as explained above, this did not exhaust the claims. Petitioner has not demonstrated cause for this default. Claims 2.P and 2.Q will be denied.

### 3. Claim 3—Prosecutorial Misconduct

In Claim 3, Petitioner asserts that the state committed prosecutorial misconduct through improper closing argument at trial. (Doc. No. 1 at 24; Doc. No. 3 at 6, 14, 30–31.) He did not raise a prosecutorial misconduct claim on direct appeal. In his *pro se* post-conviction petitions, Petitioner presented several arguments regarding prosecutorial misconduct based on the prosecutor's actions during trial and closing argument. (Doc. No. 22-29 at 86–88, 123–25.) The state court denied these claims (id. at 139–40), and Petitioner did not raise a prosecutorial misconduct claim before the TCCA on post-conviction appeal. Petitioner did assert a sprawling claim of prosecutorial misconduct throughout his *pro se* request for permission to appeal to the Supreme Court (Doc. No. 22-27 at 20, 23, 26–30), but that is not sufficient to exhaust a claim. Claim 3 is procedurally defaulted without cause.

### 4. Claim 4—Sufficiency of the Evidence

Petitioner next asserts, in Claim 4, that there is insufficient evidence to support the conviction. (Doc. No. 1 at 8; Doc. No. 3 at 14, 22.) Petitioner's presentation of this claim is based on a faulty premise, and the claim itself is procedurally defaulted. The premise is flawed because

Petitioner maintains that there is not sufficient "evidence of the conviction for felony or premeditated murder."[9] (Doc. No. 3 at 14.) But Petitioner was not convicted of these offenses. As the TCCA clearly explained on direct appeal, although the indictment *charged* Petitioner with "premeditated murder" and "felony murder in the perpetration of larceny," the jury *convicted* Petitioner of second-degree murder. Barrett, 2012 WL 2870571, at *25. Because Petitioner was not convicted of premeditated murder or felony murder, his argument that there is insufficient evidence to support convictions for those offenses is immaterial.

Regardless, Petitioner's arguments in support of his insufficient-evidence claim are procedurally defaulted. Petitioner raised an insufficient-evidence claim on direct appeal, but did not rely on the same theory as he does in his federal habeas corpus petition. That is, in the claim presented to the TCCA, Petitioner argued "that there was no eyewitness account of the crime, that the evidence is circumstantial, and that the conviction rests 'solely' upon proof of his DNA on the victim's blouse and the testimony of two convicted felons." Barrett, 2012 WL 2870571, at *25. Here, by contrast, Petitioner contends that there is insufficient evidence to support his convictions "due to lack of specificity of the indictment" (Doc. No. 3 at 14, 22), because there is no evidence of larceny or rape (id. at 14), and because there is an inadequate chain of custody regarding DNA evidence (id. at 4). Petitioner, therefore, failed to present "the same claim under the same theory [] to the state courts," so he did not properly exhaust his insufficient-evidence claim. See Wagner, 581 F.3d at 417. He has not established cause for this default, so Claim 4 will be denied.

Finally, even if the Court were to liberally construe this claim as having been exhausted on direct appeal, the state court's rejection of the claim before it was clearly reasonable. The TCCA analyzed Petitioner's insufficient-evidence claim as follows:

---

[9] Similarly, Petitioner repeatedly asserts that the indictment and jury charge were not sufficient to convict him of felony murder or larceny. (Doc. No. 3 at 17–22.)

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (citing State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The Defendant's contention is premised, in part, upon the former standard for analysis of convictions based solely upon circumstantial evidence. Previously, Tennessee law provided that for a conviction to be based upon circumstantial evidence alone, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970); see also State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). Shortly after the Defendant filed his brief, however, our Supreme Court adopted the United States Supreme Court's perspective that the standard of proof is the same, without regard to whether evidence is direct or circumstantial, eliminating the "every other reasonable theory or hypothesis except that of guilt" analysis. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Jackson, 443 U.S. at 326; Holland v. United States, 348 U.S. 121, 139–40 (1954)). We will, therefore, conduct our review in accord with Dorantes. See State v. Sisk, 343 S.W.3d 60, 68 (Tenn. 2011) (reinstating convictions based on Dorantes analysis after Court of Criminal Appeals reversed convictions for insufficient evidence under Crawford circumstantial evidence analysis but noting that intermediate court did not err in applying Crawford because its ruling was pre-Dorantes).

At the time of the Defendant's crime, the relevant statute provided that the defining characteristics of second degree murder were an unlawful, willful, and malicious killing of a victim. T.C.A. §§ 39-2401 (1975, 1985) (renumbered at T.C.A. § 39-2-201) (repealed 1989), 39-2402 (1975) (amended 1977, 1979, 1988) (renumbered at T.C.A. § 39-2-202) (repealed 1982), 39-2403 (1975) (amended 1979) (renumbered at T.C.A. § 39-2-211) (repealed 1989); see, e.g., State v. Johnson, 541 S.W.2d 417, 418–19 (Tenn. 1976); State v. Shepherd, 862 S.W.2d 557, 565 (Tenn. Crim. App. 1992).

The Defendant challenges both the sufficiency of the proof of the statutory elements of the crime and that of his identity as the perpetrator or as an aider and abettor to

the crime. In the light most favorable to the State, the record reflects that the victim died from asphyxia due to manual strangulation. Her injuries were so great that her thyroid cartilage and hyoid bone were broken. Dr. Francisco testified that this would take considerable pressure because a child's cartilage and bones were flexible. The evidence demonstrates that the killing was unlawful, willful, and malicious and is sufficient to support the conviction for second degree murder.

With respect to the proof that the Defendant perpetrated the crime, the evidence in the light most favorable to the State established that the Defendant's DNA was present on the victim's blouse. The chance of the same STR DNA profile occurring in another person was one in five quadrillion for the African–American population and one in 160 quadrillion for the Caucasian population. The Defendant's DNA alpha type was present on the victim's pants. This type was shared by only eight percent of the population. Over 100 other individuals, including virtually everyone from the victim's neighborhood, were eliminated as the contributors of the DNA evidence. Two of the Defendant's fellow inmates testified that the Defendant admitted that he killed the victim and that his DNA was on her. Their testimony regarding the altercation between the Defendant and Frank White was consistent with the video recording of the altercation. There was no indication of any prior acquaintance or association of the victim and the Defendant that might provide an alternate explanation of the presence of his DNA on her clothing. Dr. Francisco and Dr. Bass testified that the victim died at or near the time of her disappearance, which was before the Defendant was in jail. When the Defendant was arrested, he was wearing a full length coat, a ski mask, another hat, and two pairs of gloves. His clothing and physical stature were consistent with the description Ms. Maxwell gave of the adult she saw in Ms. Howard's driveway with the child she presumed was the victim. The Defendant is not entitled to relief.

Barrett, 2012 WL 2870571, at *25–26.

The TCCA thus accurately identified the federal standard governing claims for sufficiency of the evidence, as set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). "'Under Jackson, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (quoting Parker v. Renico, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second,

deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." Id. (citing Parker, 506 F.3d at 448).

Here, the state court concluded that there was sufficient evidence for the jury to find Petitioner guilty of second-degree murder as it was defined at the time of the crime—the unlawful, willful, and malicious killing of a victim. As to the elements of the crime, the TCCA's analysis focused on the testimony of Dr. Jerry Francisco, an expert in forensic pathology. The TCCA noted Dr. Francisco's testimony that he performed an autopsy on the victim and determined the cause of death to be asphyxia resulting from manual strangulation. (See Doc. No. 22-10 at 31–32.) Dr. Francisco testified that he made this determination based on his conclusions "that the victim's thyroid cartilage and hyoid bone were broken [and] that the victim had an adjacent hemorrhage, blue lips, and small hemorrhages of the scalp, surface of the chest organs, heart, and lungs." Barrett, 2012 WL 2870571, at *4. According to Dr. Francisco, it would have required "considerable pressure" to break the victim's cartilage and bones. (Doc. No. 22-10 at 32.) Based on this evidence, it was reasonable for the TCCA to find that the victim's killing was unlawful, willful, and malicious.

It was also reasonable for the TCCA to find, based on an assortment of evidence, that Petitioner committed the crime. The state court essentially based this conclusion on four factors—DNA evidence connecting Petitioner to the victim's blouse and pants, with no exculpatory explanation for how it got there; testimony of Petitioner's fellow inmates Sheldon Anter and Andrew Napper that Petitioner admitted killing the victim and that his DNA was on her; expert testimony that the timing of the victim's death coincided with a period during which Petitioner was not in jail; and testimony of the victim's neighbor that she saw an adult "with the child she

presumed was the victim," and that this adult's clothing and stature was consistent with Petitioner's at the time of his arrest in 1975.

As to DNA evidence on the victim's blouse, Jennifer Luttman testified as an expert in forensic DNA analysis. According to Ms. Luttman, there was a "reasonable degree of scientific certainty" that Petitioner was the source of DNA on the blouse. (Doc. No. 22-15 at 119.) Ms. Luttman testified that "[t]he chance of the same STR DNA profile occurring in another person was one in five quadrillion for the African–American population and one in 160 quadrillion for the Caucasian population." Barrett, 2012 WL 2870571, at *26. And as to the DNA evidence on the victim's pants, DNA expert Gary Harmor testified that Petitioner's "DNA alpha type" was on the victim's pants, and that "[t]his type was shared by only eight percent of the population." Id. Given the evidence presented to the jury, it was reasonable for the TCCA to conclude that there was sufficient evidence to convict Petitioner of second-degree murder.


### 5.       Ineffective Assistance of Trial Counsel

Finally, there are eleven remaining sub-claims of ineffective assistance of trial counsel: Claims 5.A, 5.B, 5.C, 5.E, 5.G, 5.H, 5.I, 5.J, 5.K, 5.M, and 5.N. Petitioner did not present these sub-claims to the TCCA. He did raise some of them—in particular, Claims 5.E, 5.G, 5.H, 5.J, and 5.M—in his *pro se* application for permission to appeal his post-conviction proceedings to the Tennessee Supreme Court (Doc. No. 22-37 at 5, 31–35, 37), but that does not constitute proper exhaustion. Accordingly, all eleven sub-claims are procedurally defaulted.

As noted above, supra Section V.A.4, the "'ineffective assistance of post-conviction counsel can establish cause to excuse [the] procedural default of a . . . claim of ineffective

assistance at trial.'" <u>Atkins</u>, 792 F.3d at 658 (quoting <u>Sutton</u>, 745 F.3d at 795–96). Here, in addition to several specific assertions of ineffectiveness during his initial post-conviction proceeding, Petitioner generally asserts that appointed post-conviction counsel "failed to provide meaningful assistance . . . in amending his petition for post conviction relief." (Doc. No. 3 at 10.) The Court liberally construes this as an allegation of cause to overcome the default of his remaining sub-claims of ineffective assistance at trial.

To determine whether Petitioner has effectively demonstrated cause, the Court considers "(1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were 'substantial.'" <u>Atkins</u>, 792 F.3d at 660 (citations omitted). If Petitioner demonstrates "cause," then the Court must consider "whether [he] can demonstrate prejudice." <u>Id.</u> And if Petitioner has established both "cause" and "prejudice," only then would the Court "evaluate [his] claims on the merits." <u>Id.</u> (citations omitted). Here, the Court need not reach the issue of whether post-conviction counsel was ineffective because, as explained in more detail below, Petitioner has not demonstrated that his remaining sub-claims are "substantial."

"A substantial claim is one that has some merit and is debatable among jurists of reason." <u>Abdur'Rahman v. Carpenter</u>, 805 F.3d 710, 713 (6th Cir. 2015) (citing <u>Martinez</u>, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit,' 'is wholly without factual support,' or when 'the attorney in the initial-review collateral proceeding did not perform below constitutional standards.'" <u>Porter v. Genovese</u>, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting <u>Martinez</u>, 566 U.S. at 15–16).

Through his remaining sub-claims, Petitioner asserts that counsel was ineffective both before and during trial. Because these sub-claims are insubstantial, Petitioner has not established cause to overcome their default. The Court will address each group of claims in turn.

### a.    Claims 5.A, 5.B, 5.C, 5.E, 5.G, 5.H, 5.I—Pretrial Assistance

First, in Claim 5.A, Petitioner asserts that counsel was ineffective for failing to file a motion to dismiss the indictment due to excessive pre-trial publicity. (Doc. No. 3 at 26.) This sub-claim is insubstantial because trial counsel was not deficient, and Petitioner has not demonstrated that prejudice ensued, for failing to file a motion on this ground. The Court acknowledges that there was extensive media coverage of this case. But Petitioner has not alleged, with any degree of specificity, how this publicity would have justified dismissing the indictment. In general, the preferred methods for ensuring that publicity does not undermine the constitutional fairness of a trial include questioning the prospective jurors appropriately and changing the venue.[10] See Jackson v. Houk, 687 F.3d 723, 733 (6th Cir. 2012) (discussing Mu'Min v. Virginia, 500 U.S. 415, 433 (1991) and Skilling v. United States, 561 U.S. 358, 386 (2010)). Not, as Petitioner proposes in this sub-claim, dismissing the indictment altogether. See United States v. Silver, 103 F. Supp. 3d. 370, 380 (S.D.N.Y. 2015) (noting the lack of any federal precedent for taking "the extreme step of dismissing an indictment solely based on pre-indictment publicity"). Thus, it was objectively reasonable for counsel not to file a motion to dismiss the indictment due to pretrial publicity, and Petitioner suffered no prejudice for his failure to do so. Claim 5.A will be denied.

Next, Claims 5.B and 5.C challenge counsel's performance during *voir dire*. In Claim 5.B, Petitioner asserts that "[c]ounsel failed to adequately question potential jurors to determine the extent to which they were subjected [to] and influenced by [the] constant, inflammatory and exploitative media coverage." (Doc. No. 3 at 27.) And in Claim 5.C, Petitioner asserts that "counsel failed to ask constitutionally compelled *voir dire* quest[i]ons" in light of the "tainted . . . jury pool"

---

[10] The Court notes, again, that Petitioner did not request a change of venue in this case. At the evidentiary hearing on Petitioner's post-conviction petition, Petitioner testified that he discussed requesting a venue change with counsel, and they agreed that it would not have been a helpful strategy. (Doc. No. 22-31 at 18–19.)

that resulted from "[t]he explosive, racially-charged publicity from the first trial where he was convicted of first degree murder." (Id. at 33.)

These assertions, while sensational, are devoid of factual support. That is, Petitioner does not explain how counsel's questioning was inadequate or identify any particular question counsel should have asked. Petitioner also does not allege that counsel's questioning resulted in the empaneling of a juror who was actually biased against him. See Campbell v. Bradshaw, 674 F.3d 578, 594 (6th Cir. 2012) (citation omitted) (denying habeas challenge to counsel's failure to request a venue change due to pretrial publicity where the petitioner did "not identif[y] any juror who was actually seated that indicated an inability to set aside any prior knowledge about the case or to judge the case fairly and impartially"). The Court cannot presume prejudice based on the mere existence of substantial publicity surrounding a case. Jackson, 687 F.3d at 733. Although the Court is unable to independently review the *voir dire* transcript, because it is not a part of the state court record,[11] Petitioner's conclusory assertions of inadequate questioning by counsel do not overcome the presumption of juror impartiality. See Foley v. Parker, 488 F.3d 377, 387 (6th Cir. 2007) (citing Ritchie v. Rogers, 313 F.3d 948, 962 (6th Cir. 2002)) ("Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality."). Claims 5.B and 5.C are insubstantial and will be denied as procedurally defaulted without cause.

---

[11] According to the minutes for this case, however, the jurors were "duly elected, impaneled, tried and sworn to well and truly try the issues joined and true deliverance make according to the law and evidence." (Doc. No. 22-2 at 57.) And the trial court specifically instructed the jury, after closing argument, as follows: "Members of the Jury, some of you may have been exposed to pretrial publicity in this case. *I again instruct you* that you can consider no information in reaching your verdict, other than the evidence you hear in the courtroom." (Doc. No. 22-18 at 19 (emphasis added).) From this instruction, it is reasonable to infer that the trial court had previously instructed the jury regarding pretrial publicity.

Petitioner's next sub-claim is a broad challenge to counsel's handling of Petitioner's instructions regarding DNA evidence. In Claim 5.E, Petitioner asserts that counsel "failed to properly assess and review [his] assignment of error as to the serious omissions and constitutional blunders regarding the collection, testing and custody of the purported DNA evidence." (Doc. No. 3 at 3–4.) This sub-claim, therefore, has three parts—a collection component, a testing component, and a chain of custody component. The collection component is subsumed by Petitioner's more specific challenges in Claims 5.G and 5.H, discussed below. The testing component is subsumed by Claim 5.F, Petitioner's assertion that counsel failed to obtain independent DNA testing before trial. As discussed above, supra Section V.B.3, the Court liberally construed this sub-claim to have been exhausted on post-conviction appeal, and the TCCA's rejection of it was not unreasonable.

Finally, as to the chain of custody component, Petitioner raised this same basic argument in his *pro se* post-conviction petition. That is, Petitioner asserted that counsel was ineffective for failing to challenge the chain of custody of DNA evidence at trial. (Doc. No. 22-29 at 99–100.) Here, likewise, Petitioner essentially asserts that counsel could have undermined the chain of custody at trial if he would have "properly assess[ed] and review[ed his] assignment of error" before trial. The post-conviction court rejected this claim (Doc. No. 22-29 at 141),[12] and Petitioner did not raise it on post-conviction appeal. Ineffective assistance of post-conviction counsel can act as cause only when the ineffectiveness occurs at the initial review stage, not the appeal stage.

---

[12] The post-conviction court specifically rejected Petitioner's claim that "counsel should have explored and presented cross contamination and substitution defenses to the jury." (Doc. No. 22-29 at 141.) To the extent that Petitioner is attempting to assert a different chain of custody claim here, the Court concludes that it is insubstantial because Petitioner has not provided sufficient supporting factual allegations to satisfy Habeas Rule 2(c)'s pleading standard. See Lynn v. Donahue, No. 1:14-cv-01284, 2017 WL 5930304, at *7 n.1 (W.D. Tenn. Nov. 30, 2017) (citations omitted) (noting that habeas claims are "subject to dismissal" if "they are pled only as general allegations which fail to identify the specific error and the resulting prejudice"). For instance, Petitioner seems to assert that counsel provided inadequate assistance by not addressing "the fact that Detective Bill Pridemore[] examined the case exhibits seven different times." (Doc. No. 3 at 4.) But Petitioner supports this assertion with a citation to the TCCA's opinion on direct appeal of his other case from around the same time. (Id. (citing Barrett, 2012 WL 2914119, at *5).)

<u>Atkins</u>, 792 F.3d at 661 (emphasis added) (quoting <u>West v. Carpenter</u>, 790 F.3d 693, 699 (6th Cir. 2015)) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default."). Accordingly, because the post-conviction trial court ruled on the chain of custody component of this sub-claim, it is procedurally defaulted without cause. For all of these reasons, Claim 5.E will be denied.

Turning to Petitioner's specific challenges to the collection of DNA evidence, Claim 5.G asserts that counsel provided ineffective assistance by failing to request a pretrial <u>Dunaway</u> hearing[13] "to determine whether the warrant[]less DNA search" violated the Fourth Amendment. (Doc. No. 3 at 9, 16.) Similarly, in Claim 5.H, Petitioner asserts that counsel "should have objected and moved to suppress the introduction of the test results following the warrantless [second] DNA search." (<u>Id.</u> at 15–16.) Despite using different terminology for the name of motion that counsel should have filed, the substance of both sub-claims is the same—counsel was ineffective for failing to properly challenge the admissibility of a second, warrantless DNA search before trial. The Court, accordingly, considers these two sub-claims together.

These claims have no factual support. Petitioner makes a conclusory assertion that the DNA evidence obtained from this second DNA search "played a significant role in the State's case-in-chief." (Doc. No. 3 at 15.) And he attempts to support this assertion by stating that certain "unknown male" profiles in the state's DNA reports were only connected to Petitioner after this second DNA collection. (<u>Id.</u> at 3, 9.) But there is nothing in the record to reflect that a second DNA search occurred at all, much less that it occurred in the manner described by Petitioner.

---

[13] Here, Petitioner is presumably referring to the United States Supreme Court's decision in <u>Dunaway v. New York</u>, 442 U.S. 200 (1979). In <u>Dunaway</u>, the Supreme Court held that "an investigative interrogation . . . must be supported by probable cause to avoid infringing upon an individual's Fourth Amendment right to be free from an unreasonable seizure." <u>Myers v. Potter</u>, 422 F.3d 347, 356 (6th Cir. 2005) (citing <u>Dunaway</u>, 442 U.S. at 216). Petitioner has not explained how the holding in <u>Dunaway</u> has any bearing on this claim.

Even assuming that law enforcement officers obtained a DNA sample from Petitioner without a warrant while he was in jail, however, Petitioner has not explained how this second sample was used against him in this case. It is undisputed that officers collected a DNA sample from Petitioner pursuant to a search warrant in October 2007, before his arrest. (Doc. No. 3 at 15.) And the record reflects that the crucial DNA evidence used against Petitioner during trial was based on this October 2007 sample[14]—not some later sample collected without a warrant.

Pat Postiglione, a Metro Nashville Police Detective, testified at trial that the October 2007 sample "was collected by swabbing the inside of [Petitioner's] mouth on both cheeks." Barrett, 2012 WL 2870571, at *15. Postiglione "identified the swabs used to collect evidence from [Petitioner]," and testified that these swabs "were first sent to the TBI laboratory and later sent to the SERI laboratory in California." Id.

First, as to the TBI laboratory, DNA expert Chad Johnson testified that he received Petitioner's swabs on October 25, 2007, obtained a DNA profile from the swabs, and issued a report on November 7, 2007. (Doc. No. 22-15 at 63–65.) The FBI requested the DNA profile generated at the TBI laboratory. (Id. at 65.) Jennifer Luttman, an expert in DNA analysis with the FBI, used this DNA profile—again, a DNA profile obtained from the October 2007 sample—to connect Petitioner to DNA on the victim's blouse. (Id. at 116–20.)

Second, as to the SERI laboratory, DNA expert Gary Harmor testified that he received Petitioner's swabs on December 12, 2007. (Doc. No. 22-15 at 37–38.) Harmor gave the swabs to another SERI employee named Amy Lee, who used the swabs to extract DNA. (Id. at 38–39.) Harmor then "amplified the extracted DNA, determined the typing, and wrote his report," which connected Petitioner to DNA on the victim's pants. Barrett, 2012 WL 2870571, at *19.

---

[14] Counsel, in fact, filed a pretrial motion to suppress this October 2007 DNA sample. See supra section V.A.1.

In sum, Petitioner has not demonstrated that a second, warrantless DNA search occurred, or that the state used the results of such a search against him at trial. Instead, the record reflects that experts at the TBI, FBI, and SERI relied on the DNA sample obtained pursuant to a search warrant in October 2007 to conduct testing that ultimately connected Petitioner's DNA to DNA on the victim's blouse and pants. Accordingly, counsel was not ineffective for failing to challenge the admissibility of a second, warrantless DNA search before trial, and Claims 5.G and 5.H are insubstantial.

Finally, in Claim 5.I, Petitioner asserts that counsel was unable to sufficiently attack the credibility of Sheldon Anter and Andrew Napper at trial because he failed to investigate them beforehand. (Doc. No. 3 at 13.) This sub-claim is belied by the record.

In a pretrial motion for exculpatory evidence, counsel requested background information on Anter and Napper, including whether they had been promised or provided compensation in exchange for their assistance, whether they previously provided any unreliable information in another case, and whether they demanded compensation for their cooperation in this case. (Doc. No. 22-1 at 132–33.) In regard to Anter, specifically, counsel asked whether the district attorney provided him any assistance "with respect to his pending immigration case." (Id. at 133.) The court granted the motion (Doc. No. 22-2 at 51), and counsel received the information. Counsel also filed a pretrial notice of intent to use Anter and Napper's prior convictions for impeachment purposes. (Id. at 39–40.) Then, at trial, the state attempted to mitigate the impact of this information by eliciting some of it on direct examination. (Doc. No. 22-13 at 32–35 (Anter's testimony); id. at 94, 97 (Napper's testimony).) This strategy was outside counsel's control and has no bearing on his performance. Moreover, counsel extensively cross-examined the witnesses on this information in an attempt to undermine their credibility. (Id. at 44–46, 69–76 (Anter's testimony); id. at 98–102,

105 (Napper's testimony).) While putting on Petitioner's proof, counsel also called Antonio Johnson, a Corporal at the Davidson County Sheriff's Office, to impeach Anter's prior testimony in which he denied asking Johnson about Petitioner. (Doc. No. 22-16 at 136–39.) Finally, counsel devoted a substantial portion of closing argument to Anter and Napper's asserted unreliability. (Doc. No. 22-17 at 78–81.)

For all of these reasons, the record reflects that counsel's pretrial investigation of Anter and Napper was objectively reasonable, and his handling of these witnesses at trial was not deficient. Petitioner has not identified any alternative strategy toward Anter and Napper with a reasonable probability of resulting in a different outcome. Claim 5.I will be denied.

### b.  Claims 5.J, 5.K, 5.M, 5.N—Assistance During Trial

The final group of sub-claims pertains to counsel's performance during trial. First, in Claim 5.J, Petitioner asserts that counsel was ineffective in failing to object to the admission of photographs of the victim from around the time of her death. (Doc. No. 3 at 32–33.) As context, the prosecution introduced two photographs of the victim through Virginia Trimble, her mother: one is the victim's school picture, and the other is a picture of the victim at another child's birthday party wearing the same blouse she was wearing when she disappeared. (Doc. No. 22-9 at 52, 72–73 (introduction of photographs at trial); Doc. No. 22-19 at 2–3, 8–9 photographs).) Petitioner argues that these photographs were "inflammatory," "provocative," and "extremely prejudicial," while being either "marginally probative" or "in no way probative." (Doc. No. 3 at 32–33.) Petitioner asserts that counsel should have objected to the introduction of the photographs on this basis. (Id. at 33.)

This sub-claim is insubstantial because Petitioner has failed to demonstrate both deficiency and prejudice. The Tennessee Supreme Court has explained the state law on the admissibility of photographs as follows:

> Tennessee courts have followed a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). This policy translates into the rule that "the admissibility of photographs lies within the discretion of the trial court." Id. . . . However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993) (citation omitted); see also Tenn. R. Evid. 401 and 403.

State v. Nesbit, 978 S.W.2d 872, 901 (Tenn. 1998). Moreover, "'[i]f relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; . . . the photograph would be cumulative; . . . or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" State v. Sparrow, No. M2012–00532–CCA–R3–CD, 2013 WL 1089098, at *22 (Tenn. Crim. App. Mar. 14, 2013) (quoting Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

Here, both of the challenged photographs were relevant under Tennessee law. The Tennessee Supreme Court "has previously approved of the admission during trial of a photograph taken while the victim was alive to establish the corpus delicti of the crime and to prove that the 'person killed was the same person named in the indictment.'" Id. (quoting Nesbit, 978 S.W.3d at 902).[15] And Ms. Trimble used the victim's school picture to identify her as the person named in the indictment. (Doc. No. 22-9 at 52 ("It's my Marcia.").)

---

[15] In Nesbit, the Tennessee Supreme Court also noted that under Tennessee's criminal code prior to 1989, one of the "material element[s] of the offense of murder" was "proof that the deceased was a 'reasonable creature in being,' that is, to say a child that was born alive." 978 S.W.2d at 901 n.2 (citing Morgan v. State, 256 S.W. 433, 434 (1923)). That material element appears to apply here, as the state prosecuted Petitioner for the charged offenses of first-degree murder and felony murder as they existed in 1975. The victim's school picture was also relevant for this reason.

The picture of the victim at another child's birthday party was also relevant. This picture was taken a few days before the victim's disappearance, and showed the victim wearing the same blouse as she wore when she disappeared. Barrett, 2012 WL 2870571, at *2. This blouse featured prominently in the state's case, as a DNA expert would testify that Petitioner's "DNA profile matched the major contributor's [DNA] profile developed from the blouse," and that "the random match probability was one in six trillion." Id. at *21. Accordingly, this challenged photograph was relevant to show that the blouse belonged to the victim, and that she wore it around the time of her disappearance.

Because the challenged photographs were relevant, this Court has no basis to conclude that the trial court would have found them to be inadmissible if counsel had objected to their introduction. See Sparrow, 2013 WL 1089098, at *22 (quoting Collins, 506 S.W.2d at 185) ("'If relevant, the photograph is not rendered inadmissible because the subject portrayed . . . is gruesome or for some other reason is likely to inflame the jury.'"). Petitioner, therefore, has not demonstrated that counsel was deficient for failing to do so. Moreover, given all of the evidence presented at trial, there is not a reasonable probability that there would have been a different outcome if the jury did not view two photographs of the victim while she was alive. For these reasons, Claim 5.J is insubstantial.

Next, in Claim 5.K, Petitioner asserts that counsel was ineffective for failing to object when the prosecutor played a video recording of a jail altercation without sound and explained "to the jury what was happening as the jury watched." (Doc. No. 3 at 28.) As an initial matter, the record belies Petitioner's assertion that the prosecutor explained what was happening while this recording played. It is true that the video recording did not have audio. But it was Sheldon Anter, not the prosecutor, who explained the activity in the video to the jury. Barrett, 2012 WL 2870571, at *13

("The video recording introduced during Ms. Ray's testimony, which had no audio, was played for the jury as Mr. Anter narrated it."). Anter testified that this video showed an altercation between Petitioner and fellow inmate Frank White, precipitated by White taunting Petitioner about being a "baby killer and a rapist." (Doc. No. 22-13 at 38–41.) And the TCCA found that Anter's "testimony regarding the altercation between [Petitioner] and Frank White was consistent with the video recording of the altercation." Barrett, 2012 WL 2870571, at *26.

Even liberally construing Claim 5.K as a challenge to counsel's handling of Anter's testimony regarding the video recording, however, the sub-claim is still meritless. Counsel did not lodge an objection to this testimony at trial, but he did file a pretrial motion to exclude some of Anter's expected testimony under Tennessee Rule of Evidence 404(b). (Doc. No. 22-1 at 148, 150–51.) At a pretrial hearing, Anter testified that, during the altercation, Petitioner told White that "he had killed four people and had no problem killing again," and that he would "kill [White] like [he] killed them blue-eyed bitches." (Doc. No. 22-6 at 81.) The court found Anter's testimony regarding this first statement to be admissible, and the second statement to be inadmissible. (Doc. No. 22-7 at 8–10.) Additionally, in an effort to mitigate the prejudicial effect on Petitioner, the court "redacted" the first statement by allowing Anter to testify only that Petitioner said, "I've killed before and I will kill you." (Id. at 8.) Petitioner challenged the trial court's ruling on direct appeal, and the TCCA found that the trial court did not abuse its discretion. Barrett, 2012 WL 2870571, at *32–35.

In short, counsel did not render inadequate performance by failing to object to Anter's description of the jail video recording at trial because he litigated the issue before trial. Petitioner does not explain how counsel's pretrial challenge to Anter's expected testimony was deficient, or

identify another strategy that counsel should have pursued on this issue. Claim 5.K is not substantial.

The remaining two sub-claims—Claims 5.M and 5.N—accuse counsel of ineffectiveness for failing to request certain jury instructions. In Claim 5.M, Petitioner asserts that counsel should have requested an instruction on the unreliability of Sheldon Anter and Andrew Napper because they were "criminal and/or professional informants." (Doc. No. 3 at 23.) Claim 5.N, meanwhile, relates to Anter's testimony regarding statements made by Frank White. Here, Petitioner asserts that White testified against him "through the mouth of . . . Sheldon Anter," so counsel should have requested an instruction on the "absentee witness rule." (Id. at 25–26.)

When reviewing a habeas petitioner's claim regarding an omitted jury instruction, the Court considers whether the absence of the instruction "'so infected the entire trial that the resulting conviction violates due process.'" Leberry v. Howerton, 583 F. App'x 497, 502 (6th Cir. 2014) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)). The asserted error "'must be so egregious that [it] render[ed] the entire trial fundamentally unfair. Without such a showing, no constitutional violation is established and the petitioner is not entitled to relief.'" Wade v. Timmerman-Cooper, 785 F.3d 1059, 1078 (6th Cir. 2015) (quoting White v. Mitchell, 431 F.3d 517, 533 (6th Cir. 2005)). This is a "very high burden," id., and Petitioner has not met it in Claims 5.M and 5.N.

First, counsel did not perform deficiently by failing to request an instruction on "criminal and/or professional informants." The Court "review[s] jury instructions 'as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.'" Dixon v. Houk, 737 F.3d 1003, 1010 (6th Cir. 2013) (quoting United States v. Frederick, 406 F.3d 754, 761 (6th Cir. 2005)). Thus, a

defendant's constitutional rights are not violated where the trial court "'adequately inform[s] the jury regarding the credibility of witness testimony' and 'alert[s] the jury to the various considerations that it should take into account in weighing testimony.'" <u>Goff v. Bagley</u>, 601 F.3d 445, 469 (6th Cir. 2010) (quoting <u>Scott v. Mitchell</u>, 209 F.3d 854, 883 (6th Cir. 2000)).

Here, the trial court thoroughly instructed the jury regarding the credibility of witness testimony. (Doc. No. 22-18 at 24–26.) These instructions were constitutionally adequate, and, indeed, directly addressed several of Petitioner's stated concerns regarding the unreliability of Anter and Napper. Petitioner states that: Napper previously worked as a police informant (Doc. No. 3 at 23); Anter disliked Petitioner (<u>id.</u> at 28); both Anter and Napper received or expected to receive benefits from the state in exchange for their testimony (<u>id.</u> at 13); and both had criminal backgrounds (<u>id.</u> at 23). During trial, the jury heard testimony about these topics from Anter and Napper. And the court instructed the jury, in part, as follows:

> In forming your opinion, as to the credibility of a witness, you may look to the proof, if any, of the witness' reputation for truth and veracity; the intelligence and respectability of the witness; *his or her interest or lack of interest in the outcome of the trial*; his or her feelings; *his or her apparent fairness or bias*; his or her means of knowledge; his or her appearance and demeanor while testifying; his or her contradictory statements as to material matters, if any are shown; and all the evidence in the case tending to corroborate or to contradict him or her.

> \* \* \*

> If, from the evidence presented, you find that a witness has been convicted of a prior crime, you can consider such only for the purpose of its effect, if any, on his or her credibility as a witness.

(<u>Id.</u> at 24–25 (emphasis added).)

The jury had all of the information and instruction necessary to evaluate the credibility of Anter and Napper's testimony. The absence of a specific instruction on "criminal and professional

informants" did not deprive Petitioner of due process, and counsel was not deficient for failing to request this instruction at trial. Claim 5.M will be denied.

Second, counsel was also not deficient for failing to request an instruction on the "absentee witness rule" addressed in Claim 5.N. Petitioner does not explain what this instruction would have entailed. It appears, however, that Petitioner believes he was entitled to some kind of special instruction because the introduction of Frank White's statements, through Sheldon Anter's testimony, violated the Confrontation Clause. (See Doc. No. 3 at 25–26); California v. Green, 399 U.S. 149, 179 (1970) (Harlan, J., concurring) ("From the scant information available it may tentatively by concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses."). Petitioner is mistaken.

"The Confrontation Clause guarantees a defendant the opportunity to cross-examine the witnesses against him." Landers v. Romanowski, 678 F. App'x 295, 300 (6th Cir. 2017) (citing United States v. Owens, 484 U.S. 554, 559 (1998)). This right of confrontation, however, "applies only to testimonial statements." Jackson v. Stovall, 467 F. App'x 440, 443 (6th Cir. 2012) (citing Davis v. Washington, 547 U.S. 813, 823–26 (2006)). While the Supreme Court has not established "a comprehensive definition of 'testimonial,'" Crawford v. Washington, 541 U.S. 36, 68 (2004) (footnote omitted), it has noted that "[t]estimony . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. at 51 (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). Accordingly, the term "testimonial" most readily applies to statements made at a preliminary hearing, grand jury proceeding, previous trial, or police interrogation. Id. at 68.

Here, Anter testified about a statement White made when "taunting" Petitioner in a common area at the jail immediately prior to a physical altercation between White and Petitioner. (Doc. No. 22-13 at 38–39); Barrett, 2012 WL 2870571, at *13 ("Mr. Anter testified that on August 16, 2008, Mr. White was taunting the Defendant about being a 'baby killer and a rapist.'").) Later that evening, Anter testified, White continued to taunt Petitioner through vents in the cells. (Doc. No. 22-13 at 40.) Thus, White's statements were far from the type of "testimonial" statements that trigger the protections of the Confrontation Clause. For this reason, counsel was not deficient for failing to request a special jury instruction regarding White's supposedly "testifying against [Petitioner] through" Anter. Petitioner also has not demonstrated a reasonable probability of a different outcome if counsel had requested such an instruction. Claim 5.N is procedurally defaulted without cause because it is insubstantial.

## VI.    Requests for Discovery and an Evidentiary Hearing

In the reply, Petitioner seeks discovery under Habeas Rule 6 and an evidentiary hearing under Habeas Rule 8. (Doc. No. 33 at 45–48.) Petitioner is entitled to neither.

First, habeas petitioners do not have a "'right to automatic discovery.'" Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004) (quoting Stanford v. Parker, 266 F.3d 442, 460 (6th Cir. 2001)). "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Id. (quoting Bracy v. Gramley, 520 U.S. 899, 908–09 (1997)). "'Conclusory allegations are not enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact.'" Cornwell v. Bradshaw, 559 F.3d 398, 409 (6th Cir. 2009) (quoting Williams, 380 F.3d at 974).

Here, the only specific factual allegations Petitioner attempts to present in support of his discovery request, as relevant to this case,[16] pertain to Sheldon Anter and Andrew Napper. Petitioner alleges that both Anter and Napper "had a tacit non-prosecution agreement in return for their testimony," and that Napper "had a tacit sentence reduction agreement in return for his testimony." (Doc. No. 33 at 46.) These allegations appear to be speculative rationalizations for why Anter and Napper agreed to testify, rather than concrete factual allegations. (See id. at 47 ("[T]here is a *prima facie case* [sic] that the State did in fact have a non-prosecution and leniency agreement with its key witnesses and is knowingly concealing these facts, acting as if these witnesses simply came forward out of the goodness of their hearts, as good citizens.").) Accordingly, Petitioner's request for evidence is akin to an impermissible "fishing expedition." Williams, 380 F.3d at 974 (quoting Rector v. Johnson, 120 F.3d 551, 562 (5th Cir. 1997)) ("Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'").

Even if the state possessed evidence regarding favorable agreements with Anter and Napper, moreover, these materials would not entitle Petitioner to relief. "'[W]here undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" Davis v. Gross, No. 18-5406, 2018 WL 8138536, at *3 (6th Cir. Sept. 10, 2018) (quoting Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000)). As the Court explained when rejecting Petitioner's claim that counsel was ineffective for failing to investigate Anter and Napper's backgrounds, supra Section V.C.5.a,

---

[16] Petitioner also alleges that the state withheld material regarding "the TBI investigation of Dr. Levy." (Doc. No. 33 at 47.) But no one by that name testified at Petitioner's trial in this case. Instead, this seems to be another reference to Petitioner's other criminal case from around the same time. See Barrett v. State, No. 2007-D-3201, 2015 WL 13756082, at *3 (Tenn. Crim. Ct. May 18, 2015) (denying Petitioner's post-conviction claim that counsel was ineffective for failing to investigate "whether Dr. Levy was being investigated by the TBI at the time of his trial"), rev'd on procedural grounds, No. M2015-01143-CCA-R3-PC, 2016 WL 4768698 (Tenn. Crim. App. Sept. 12, 2016). This allegation, therefore, does not justify discovery here.

both the prosecutor and counsel questioned them on their criminal histories and dealings with the state. This questioning covered Napper's prior work as a police informant, and counsel called a jail officer to testify for the sole purpose of impeaching Anter's testimony. "Given these circumstances, evidence that [Anter and Napper] struck deals in the current case, while undoubtedly a basis for impeachment, would have been cumulative in light of the other impeachment that occurred." Davis, 2018 WL 8138536, at *3 (citing Byrd, 209 F.3d at 518). Cumulative impeachment evidence is not a basis for discovery. See id.

Petitioner is also not entitled to an evidentiary hearing. "[W]ith a few exceptions," none of which apply here, a district court "'shall not hold an evidentiary hearing on [a] claim'" where "'the applicant has failed to develop the factual basis of [the] claim in State court proceedings.'" Hodges v. Colson, 727 F.3d 517, 541 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(e)(2)). And the Court cannot consider new evidence on claims that were adjudicated on the merits in state court. Id. (citing Pinholster, 563 U.S. at 181). Finally, "[a] district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'" Muniz v. Smith, 647 F.3d 619, 625 (6th Cir. 2011) (quoting Schiro v. Landrigan, 550 U.S. 465, 474 (2007)). Applying these principles to this case, and for the reasons stated throughout the Court's analysis of Petitioner's claims, Petitioner's request for an evidentiary hearing will be denied.

## VII.    Conclusion

For these reasons, Petitioner's claims are either not cognizable, fail on the merits, or procedurally defaulted. He is also not entitled to discovery or an evidentiary hearing. Accordingly, the Petition (Doc. Nos. 1 and 3) will be denied and this action will be dismissed.

Because this constitutes a "final order adverse to" Petitioner, the Court must "issue or deny a certificate of appealability." Habeas Rule 11(a). A certificate of appealability may issue only if

Petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Dufresne v. Palmer, 876 F.3d 248, 253 (6th Cir. 2017) (quoting Slack, 529 U.S. at 484). Here, the Court concludes that Petitioner has not satisfied these standards, and will therefore deny a certificate of appealability.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE